COMMONWEALTH *vs.* DANIEL DOWNEY
(and a companion case[1]).

No. 04-P-1192.

Suffolk. November 10, 2005. - February 22, 2006.

Present: GREENBERG, BERRY, & GRAHAM, JJ.

*Privileged Communication. Consent. Attorney at Law,* Conflict of interest. *Conflict of Interest.*

In a criminal trial where the defendants' trial counsel wore concealed microphones without their respective clients' consent pursuant to a recording agreement with a film company, the attorneys' conduct gave rise to an actual conflict of interest that undermined the attorney-client relationship; created a real and present prospect that confidential information would be, and was in fact, disclosed; and deprived the defendants of their State and Federal constitutional right to effective assistance of counsel. [551-556]

INDICTMENT found and returned in the Superior Court Department on March 24, 1998.

After review by this court, 58 Mass. App. Ct. 591 (2003), a motion for a new trial was heard by *Daniel A. Ford,* J.

INDICTMENT found and returned in the Superior Court Department on March 24, 1998.

The case was tried before *Daniel A. Ford,* J., and a motion for a new trial, filed on November 17, 2003, was heard by him.

*Dean A. Mazzone,* Assistant District Attorney, for the Commonwealth.

*Stephen B. Hrones* (*Jessica D. Hedges* with him) for Joseph Downey.

---

[1]Commonwealth *vs.* Joseph Downey. After the remand in *Commonwealth* v. *Downey,* 58 Mass. App. Ct. 591 (2003), which only pertained to defendant Daniel Downey, Joseph Downey also made a motion for a new trial, which was granted. Both cases are before us on this appeal by the Commonwealth.

*Michael J. Traft* for Daniel Downey.

BERRY, J. These companion cases involve the extraordinary and legally portentous circumstance of two defense counsel for two defendant brothers on trial for murder in the first degree entering into an arrangement with the film company Lion Television Limited (Lion), in which, without the consent of their clients, the lawyers undertook to wear concealed microphones tied to recording devices during the course of a criminal trial. The attorneys' communications with their clients during trial were within range of the hidden microphones and were captured, if the microphones were not shut off, or if the recording system was not muted. As shall be seen, the microphones remained active during most of, if not all of, the trial and did, in fact, record privileged attorney-client communications, certain of which were later broadcast on television and published in print. As noted, all of this was done without the consent or, initially, the knowledge of the accused clients being tried.[2]

The trial judge was also unaware that defense counsel were equipped with hidden microphones and that the attorneys' voices and communications with their clients were being recorded.[3] Thus, unbeknownst to the trial judge and without the consent of the defendants, the broadcast recording arrangement not only

___

[2]The motion judge specifically found that the defendants were unaware that their attorneys were wearing hidden microphones until the second day of the trial. The judge also found that the defendants thought that the judge had approved the use of the microphones and that there were supportable reasons why the defendants did not voice their objections directly to the trial judge when they became aware of the microphones.

[3]Because there were cameras in the courtroom, the trial judge was, of course, aware that the proceedings might be filmed. Such filming — apart from the hidden recording devices at issue in this appeal — is authorized, within certain confines, by S.J.C. Rule 1.19, 428 Mass. 1301 (1998), which permits "broadcasting, televising, electronic recording, or taking photographs of proceedings open to the public in the courtroom by the news media for news gathering purposes."

Although S.J.C. Rule 1.19 fosters the free flow of public information in our courthouses, it is balanced to ensure the fair administration of justice by imposing limitations on broadcasting, including the following:

> "(a) A judge may limit or temporarily suspend such news media coverage, if it appears that such coverage will create a substantial likelihood of harm to any person or other serious harmful consequence.
>
> ". . .

reached public speech and acts in the courtroom, but also intercepted private and privileged conversations between the lawyers and clients on trial.[4]

In our opinion, as confirmed by the additional evidence developed in an evidentiary hearing conducted on remand from a prior appeal to this court (see *infra*), the recording arrangement that defense counsel entered into constituted a direct, actual conflict of interest. For the accused clients on trial, the unconsented-to broadcast agreement infringed Federal and State constitutional rights to legal representation and a fair trial unfettered by any divided allegiances on the part of defense counsel.[5]

"(c) During the conduct of a jury trial, a judge should not permit recording or close-up photographing or televising of bench conferences, *conferences between counsel, or conferences between counsel and client*" (emphasis added).

The arrangement here, however, went far beyond that allowed by the rule. The lawyers, in effect, became a part of the speaking and acting crew and cast and brought the unwitting and non-consenting defendants within this circle.

[4]The agreement, which was introduced as an exhibit at the remand hearing (see *infra*), reveals that a plan for filming the criminal cases originated in an arrangement involving Lion, WGBH Channel 2 (WGBH), and the Suffolk County district attorney's office. The agreement makes clear that the broadcast plan not only included footage of in-court public criminal proceedings (see note 3, *supra*), but also granted Lion and WGBH direct access to prosecutors responsible for open cases and encompassed interoffice conferences among prosecutors in the district attorney's office and plea negotiation conferences between prosecutors and defense counsel. The appellate record does not include any written agreements with any defense counsel. It is apparent, however, from the agreement with the district attorney's office that it was envisioned that the broadcast program would include out-of-court background commentary by, and interviews with, prosecutors, as well as law enforcement agents, defense counsel, victims, and witnesses. The agreement states that the broadcast would not be transmitted until "after the relevant cases have been tried to verdicts."

Under the agreement, the broadcast program was originally to be entitled "Boston D.A." That title was changed, and ultimately there was produced and broadcast on WGBH's "Frontline" a two-part series entitled "Real Justice," covering criminal proceedings in State courts located in Boston. The Frontline series was introduced as an exhibit in videotape form at the remand hearing, and we have reviewed that videotape. In addition to the *Downey* case, a number of cases pending in the District and Superior Courts of Suffolk County are also depicted in the Frontline program.

[5]The Sixth Amendment to the Constitution of the United States provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the

For the trial lawyers conducting the defense of the accused on trial, the broadcast agreement breached the attorneys' ethical and representational obligations to conduct the defense in a criminal proceeding to the fullest extent of the attorneys' advocacy skills unencumbered by any competing allegiances.[6,7,8]

This is the third time the case has come before this court. First, on direct appeal, the convictions were affirmed. *Commonwealth* v. *Downey*, 56 Mass. App. Ct. 1111 (2002) (*Downey I*). Second, posttrial, there was an appeal from the denial of a new trial motion by defendant Daniel Downey, which new trial motion and ensuing appeal were predicated upon the constitutional flaws in legal representation arising out of the defense attorneys' broadcast arrangement. *Commonwealth* v. *Downey*, 58

right . . . to have the Assistance of Counsel for his defence." Article 12 of the Massachusetts Declaration of Rights provides, in pertinent part, that "every subject shall have a right . . . to be fully heard in his defence by himself, or his counsel, at his election."

[6]Rule 1.3 of the Mass.R.Prof.C., 426 Mass. 1313 (1998), sets the standard: "The lawyer should represent a client zealously within the bounds of the law."

[7]With respect to potential conflicts of interest of an attorney, Mass.R. Prof.C. 1.7(b), 426 Mass. 1330 (1998), provides, in pertinent part:

> "A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless: (1) the lawyer reasonably believes the representation will not be adversely affected; and (2) the client consents after consultation. . . ."

[8]The American Bar Association Standards for Criminal Justice also speak to the core principle that there be undivided loyalty of defense counsel to the client. Specifically, the standards provide:

> "Defense counsel should not permit his or her professional judgment or obligations to be affected by his or her own political, financial, business, property, or personal interests.

> "Defense counsel should disclose to the defendant at the earliest feasible opportunity any interest in or connection with the case or any other matter that might be relevant to the defendant's selection of counsel to represent him or her or counsel's continuing representation. Such disclosure should include communication of information reasonably sufficient to permit the client to appreciate the significance of any conflict or potential conflict of interest."

Standard 4-3.5(a)-(b), Conflicts of Interest, ABA Standards for Criminal Justice: Prosecution Function and Defense Function (3d ed. 1993).

Mass. App. Ct. 591 (2003) (*Downey II*).[9] In *Downey II*, we remanded for an evidentiary hearing to determine the facts concerning whether (a) the defendants had in any way consented to their trial attorneys' recording and broadcast arrangement[10]; (b) if there was not such consent, the recording deal by the attorneys posed an actual conflict in the legal representation of the defendants in the trial on the murder indictments; and (c) the defendants' constitutional rights to effective assistance of counsel and a fairly conducted trial were otherwise impaired. *Id.* at 592.[11]

Having conducted an evidentiary hearing on remand, the Superior Court judge (who also had presided over the original murder trial) issued orders and a comprehensive memorandum, which set forth detailed factual findings directed to these central questions. Given the evidence adduced before him, the judge decided that a new trial was warranted. In the present third appeal in our court, the Commonwealth challenges the new trial orders. We affirm.

We begin with the fundamental precepts that govern criminal trials in the American system of justice. "The right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution' to which they are entitled." *Strickland* v. *Washington*, 466 U.S. 668, 685 (1984), quoting from *Adams* v. *United States ex rel. McCann*, 317 U.S. 269, 275 (1942). Integral to the preservation of constitutional representation rights under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights is that a defendant must be able to seek the advice

---

[9]In *Downey II*, a fuller description of the background of the attorneys' recording arrangement is set forth, and accordingly, these details need not be repeated here.

[10]Absent consent, any revelation of client confidences by means of the microphones would be prohibited by the ethical rules: "A lawyer shall not reveal confidential information relating to representation of a client unless the client consents after consultation . . . ." Mass.R.Prof.C. 1.6(a), 426 Mass. 1322 (1998).

[11]After this court's decision in *Downey II*, defendant Joseph Downey made a motion for a new trial raising issues similar to those raised by defendant Daniel Downey. See note 1, *supra.*

and guidance of his attorney and must be able to rely on the undivided loyalty of his counsel to present the defense case with full force and zealousness. "The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel . . . . [A defendant] lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him." *Gideon* v. *Wainwright*, 372 U.S. 335, 344-345 (1963), quoting from *Powell* v. *Alabama*, 287 U.S. 45, 68-69 (1932). The evidence presented at the remand hearing, confirmed by the judge's findings,[12] makes clear beyond any question that these constitutional rights of fair and full legal representation were violated and, accordingly, that a new trial is compelled.

1. *The absence of the defendants' consent.* Based on the evidence presented at the remand hearing, the judge's findings and answer to the question whether the defendants had consented to their lawyers wearing microphones and recording privileged conversations during trial was unequivocal:

> "[I]t is abundantly clear that neither Daniel nor Joseph voluntarily, knowingly and intelligently consented to the agreement which his attorney reached with Lion to wear a body microphone . . . . Moreover, even if their silence about the issue could be construed to be consent, it is clear that neither [attorney for the defendants] explained to them the potential pitfalls of the microphone arrangement and therefore that their consent was not voluntarily, knowingly, and intelligently given."

Given the lack of consent, we turn then, as did the Superior Court judge, to the ensuing questions whether the attorneys' wearing of the microphones under their recording arrangement with Lion gave rise to an actual conflict of interest that undermined the attorney-client relationship, disclosed confidences and client secrets, and yielded constitutionally inadequate representation.

---

[12]We review the allowance of a motion for a new trial for abuse of discretion or error of law. *Commonwealth* v. *Hill*, 432 Mass. 704, 710 (2000). The judge's "findings of fact after an evidentiary hearing on a motion for a new trial will be accepted if supported by the record." *Commonwealth* v. *Walker*, 443 Mass. 213, 224 (2005).

2. *The conflict issues and adequate legal representation.* The judge found there was an actual conflict of interest:

"[T]he testimony at the hearing on these motions has led me to the conclusion that both [defense counsel] had competing responsibilities. On the one hand, they had a responsibility to their clients to focus their full attention on the trial of the case, and to maintain the confidentiality of their conversations with their clients. On the other hand, they assumed a responsibility to Lion to wear microphones and thus to jeopardize the confidentiality of their conversations . . . . In effect, they obligated themselves to permit an intrusion into the attorney-client relationship."

These findings, amply supported by the evidence at the remand hearing, establish divided loyalty by defense counsel that, as matter of law, posed an actual conflict of interest. Given the attorneys' "extra" allegiances to the broadcasting company, it cannot be gainsaid that the attorneys' trial advocacy for the defendants was not "unrestrained by commitments to others." *Commonwealth* v. *Martinez,* 425 Mass. 382, 388 (1997), quoting from *Commonwealth* v. *Michel,* 381 Mass. 447, 453 (1980). Simply put, the defendants were represented by counsel who had competing interests.[13]

Our State law is settled: where there is an actual conflict of interest, a defendant need not prove specific prejudice. Rather, prejudice is presumed to flow from the conflict.[14] *Commonwealth* v. *Martinez, supra* at 388. *Commonwealth* v. *Allison,* 434 Mass.

---

[13]The Commonwealth invokes a phrase in *Downey II* that an *"agreement* to disclose," *id.* at 597 n.11, would constitute a conflict, and argues that because the attorneys were not obligated to disclose information, no conflict existed. We reject this syllogism, and adopt the thoughtful analysis of the trial judge:

"The Commonwealth argues in opposition to these motions that Daniel and Joseph have failed to prove an actual conflict of interest, because [defense counsel] were not *obligated* to commit breaches of their duty of confidentiality and that there was no *agreement* to disclose confidential client communications. I respectfully disagree. [Defense counsel] entered into an agreement with Lion which obligated them either to remember to turn off the microphone each and every time they spoke privately with their clients, or to trust the production crew to turn off the sound each and every time such a conversation was taking place."

[14]This presumption exists as part of the protection accorded criminal

670, 688 (2001). As we observed in *Downey II*, once there is a conflict of interest in criminal defense representation, a defendant should not be, and is not, required to prove by particularized example the precise manner and means by which the conflict hurt the defense, that is, whether a particular act was not done by trial counsel to the defense, or whether if a particular act was done, it was prejudicially done. Nor, to obtain a new trial, is a defendant required to disclose what matters were not communicated to and from the attorney and the accused client, or what matters were communicated and were, thereby, placed at risk of disclosure because of the attorney's conflicted representation. To demand that a defendant bear such burdens of proof of and concerning what would have been said but was silenced, and what transpired or did not transpire between the accused on trial and his lawyer would, in effect, corrode the overarching metal of the attorney-client structure that rests on the bedrock of the constitutional right to effective representation. To impose such burdens of proof on a defendant, as we said in *Downey II*, would yield "a Pyrrhic victory for the defendant to gain a new trial if in order to do so he must disclose information or trial strategy previously withheld to protect its confidentiality." *Id.* at 597 n.12.

Given the foregoing, the new trial motions could have been allowed solely on the basis of the attorneys' actual conflict. The Superior Court judge, however, with commendable diligence, did not rest his decision exclusively on presumed prejudice flowing from the attorneys' actual conflict. Instead, the judge delved deeper during the evidentiary hearing and, in extended findings, ruled that the recording plan, even apart from the legally imposed presumption of prejudice, in reality deprived the defendants of their right to effective assistance of counsel. According to the judge's findings, "there were times during the course of the trial when [the defendants] felt intimidated by the microphones and therefore . . . were not as forthcoming with their attorneys as they otherwise might have been." In our opinion, both the risk and actuality of unauthorized disclosures of privileged communications manifestly undermined the attorney-client relationship and the obligation of counsel to

defendants pursuant to art. 12. Compare *Commonwealth* v. *Hodge*, 386 Mass. 165, 169-170 (1982).

advance a vigorous defense. Thus, there was a real and present prospect that confidential information would be, and was, in fact disclosed, piercing the "heart of the relationship of confidence between the defendant and his attorney." *Downey II*, 58 Mass. App. Ct. at 595.

As demonstrative of the breach of confidences, the judge noted that one such recorded conversation not only was broadcast on the nationwide television program "Frontline," but also was subsequently published in a book.[15] The published conversation involved one trial attorney's advice during the course of trial directed to the prospect of the defendant entering a plea of guilty. Such privileged and confidential communication lies at the heart of confidential and strategic decisions between the accused client and defense counsel — which is precisely why the law for centuries has protected privileged attorney-client communication. See, e.g., *Geders* v. *United States*, 425 U.S. 80 (1976). Wigmore describes the attorney-client privilege as "the oldest of the privileges for confidential communication." 8 Wigmore, Evidence § 2290, at 542 (McNaughton rev. ed. 1961). See Imwinkelried, The New Wigmore: Evidentiary Privileges § 2.2 (2002). The attorney-client privilege "is founded upon the necessity, in the interest and administration of justice, of the aid of persons having knowledge of the law and skilled in its practice, which assistance can only be safely and readily availed of when free from the consequences

---

[15]Lion shared its recorded tapes with an author, Sean Flynn, who in turn incorporated the privileged plea-related communication taken from the tapes in a book entitled Boston Law: The True Story of a War on Crime (2000). In his findings, the judge quoted from the chapter of Boston Law entitled "The Downey Brothers," at 276-277, as follows:

"[Daniel Downey's attorney] went to [defendant] Danny Downey, leaned in close to him at the defense table, and whispered the hard truth. 'The offer made to you is absolutely reasonable, it really is,' [his counsel] told him. 'You can't turn it down in good conscience, not facing what you face. The problem is him.'

"[Joseph Downey's attorney] tipped his head over his left shoulder, toward [defendant] Joe Downey. [His attorney] was whispering too in his ear. 'It's a serious offer,' he said, 'in that he's essentially offering you the rest of your life. And I don't know what to tell you in terms of how you want to play that gamble.' "

or the apprehension of disclosure." *Matter of a John Doe Grand Jury Investigation,* 408 Mass. 480, 481-482 (1990), quoting from *Hunt* v. *Blackburn,* 128 U.S. 464, 470 (1888).

In the extreme and unusual circumstances of these cases,[16] the intertwined conflict-ridden representation and the open breaches of confidences and privileges splintered true attorney-client relationships and deprived the defendants, who had not consented to this agreement, of the effective legal assistance at trial guaranteed by the Massachusetts and United States Constitutions.

*Orders allowing motions for
new trial affirmed.*

---

[16]Only the background of the *Downey* cases are before this court. This appellate record neither confirms nor negates the existence of, or the manner of the clients' consent with respect to, the recording of privileged attorney-client communications in the other cases that were a part of the Frontline broadcast. (See note 4, *supra.*) Given the unique factual and legal matrix of the *Downey* cases, and the detailed findings after hearing entered by the Superior Court judge that there was no consent by the Downey defendants to the intercepted, privileged attorney-client communications, this present decision is not to be construed as reaching other cases that may have been subjects of the Frontline series, as to which both the case facts and the existence of client consents may differ.