## COMMONWEALTH *vs.* LEE PERKINS.

Suffolk. December 6, 2007. - March 20, 2008.

Present: MARSHALL, C.J., IRELAND, SPINA, CORDY, & BOTSFORD, JJ.

*Homicide. Practice, Criminal,* Capital case, New trial, Defendant's decision not to testify, Required finding, Motion to suppress, Cameras in courtroom, Assistance of counsel. *Search and seizure,* Expectation of privacy. *Attorney at Law,* Conflict of interest. *Conflict of Interest. Deoxyribonucleic Acid. Evidence,* Identity, Hearsay, Exculpatory, Relevancy and materiality. *Due Process of Law,* Fair trial, Assistance of counsel. *Constitutional Law,* Search and seizure, Assistance of counsel.

At the trial of indictments charging, inter alia, murder in the first degree on the theory of deliberate premeditation, a Superior Court judge properly denied the defendant's motion for a required finding of not guilty, where the location and depth of the single stab wound to the victim's heart invited a finding that death was not only intended, but was delivered with measured certainty while the victim was lying on her back; moreover, the jury could have found that the defendant raped the victim at knife point, then killed her to prevent her from identifying him to police. [839-840]

A Superior Court judge properly denied the criminal defendant's motion to suppress evidence consisting of the butts of two cigarettes he smoked and the soda can from which he drank during his interrogation by police, as well as the fruits of that evidence, namely, DNA testing, where the judge correctly determined that the cigarette butts had been abandoned by the defendant, without inducement, and where the defendant did not have a reasonable expectation of privacy in the soda can (which also could have been considered abandoned), given that guards at the correctional institution in which the defendant was incarcerated would not have permitted him to take the can with him. [840-843]

At a murder trial, the judge properly precluded defense counsel from questioning a witness (the victim's friend and former roommate) about her husband's violent conduct against her to support the defendant's theory that the witness's husband was the true culprit, where the evidence was too remote in time, had insufficient probative value to cast doubt on the identification of the defendant as the responsible party, and would have prejudiced the Commonwealth unfairly by confusing the jury. [843-844]

At the trial of indictments charging the defendant with murder in the first degree and aggravated rape, the judge properly admitted evidence consisting of a witness's description of the victim's voice as an anxious whisper on the telephone one evening when the victim was alone with the defendant, where that evidence was relevant to rebut a theory that the victim would have had consensual sexual intercourse with the defendant, and was not offered for the truth of any matter asserted. [844]

A Superior Court judge properly denied the criminal defendant's first motion
for a new trial, where there was no merit to his contention that constitutional
violations resulted from his inability to testify at trial due to the side ef-
fects of a prescribed medication, as he never complained to anyone about
side effects from that medication at trial. [844-846]

A Superior Court judge properly denied the criminal defendant's second mo-
tion for a new trial, claiming ineffective assistance of counsel in violation
of his constitutional rights, where although his trial counsel created an
actual conflict of interest by agreeing to the request of a television produc-
tion company filming a documentary that he wear a wireless microphone
during trial, thereby permitting an intrusion into confidential attorney-
client communications, the defendant gave voluntary, knowing, and intel-
ligent consent to counsel's arrangement in a manner that was clear and
unambiguous [846-855]; further, the facts that counsel did not initiate a
colloquy with the judge about the use of a wireless microphone, and that
the judge took no steps to ensure that privileged communications remained
private, were not fatal, where there was no evidence that the defendant had
suffered any prejudice from counsel's arrangement [855-857].

INDICTMENTS found and returned in the Superior Court Depart-
ment on October 27, 1997.

A pretrial motion to suppress evidence was heard by *Elizabeth
B. Donovan,* J.; the cases were tried before *Robert A. Mulligan,*
J.; a motion for new trial, filed on April 11, 2001, was heard by
*Barbara J. Rouse,* J.; and a second motion for new trial, filed
on March 30, 2004, was heard by *Christine M. McEvoy,* J.

*Richard J. Shea* for the defendant.

*David D. McGowan,* Assistant District Attorney (*John P.
Zanini,* Assistant District Attorney, with him) for the Com-
monwealth.

SPINA, J. The defendant was convicted of deliberately pre-
meditated murder (the only theory of murder submitted to the
jury) and aggravated rape. He filed two motions for a new trial.
In the first, he claimed that during trial he was under the effects
of medication that prevented him from assisting in his defense
and prevented him from voluntarily and knowingly waiving his
right to testify. He also claimed counsel was ineffective for fail-
ing to bring the defendant's condition to the attention of the trial
judge and request appropriate relief. That motion was denied. In
the second motion for a new trial the defendant alleges his coun-
sel's representation was impaired by an actual conflict of interest
by virtue of counsel's agreement with a British television produc-

tion company, pursuant to which counsel wore a wireless microphone so that their confidential conversations could be recorded to provide material for a television documentary, all without the defendant's consent. The second motion for a new trial was denied. On appeal the defendant argues that (1) his motion for a required finding of not guilty should have been allowed as to the element of deliberate premeditation; (2) his motion to suppress physical evidence should have been allowed; (3) the trial judge erred in certain evidentiary rulings; and (4) his motions for a new trial should have been allowed. We affirm the convictions and the orders denying the motions for a new trial, and we decline to grant relief under G. L. c. 278, § 33E.

1. *Facts.* A jury could have found the following facts. See *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-678 (1979).

In the summer of 1989, Sally,[1] the victim, was nineteen years old, and she had a one year old son. She moved into an apartment on Huntington Avenue in Boston and started a job. In the fall she began studies at the University of Massachusetts in Boston. In January, 1990, her friend, Immaculata Kigoni (known as Emma), moved in with her. One Saturday in early February, Emma provided care to Sally's child while Sally went grocery shopping. When she returned, she was accompanied by the defendant. Sally introduced him to Emma as someone she had just met, who offered to carry her groceries. The defendant put the groceries down and left.

About two weeks later the defendant appeared at Sally's apartment in the late evening. She opened the door and told him she had company. Melvin Sampson, Emma's future husband, was visiting Emma. He told the defendant to leave. One night two weeks later the defendant again arrived uninvited at the apartment. Sally let him in. She and Emma were getting ready to go to sleep. The defendant spoke to Sally for twenty to thirty minutes before leaving. One night in early March, 1990, Emma was visiting her parents. She received a telephone call from Sally at about 10 P.M. Sally was whispering, and her voice sounded anxious. Emma took a bus to Sally's apartment, arriving within one hour. The defendant was sitting on Sally's bed.

[1]A pseudonym.

Emma made her presence felt. About ten minutes later the defendant left.

On March 16, 1990, Emma was married and moved to her husband's home in Norwood. She saw Sally on Wednesday, March 21, and they made plans to get together on Saturday, March 24. On Thursday morning, March 22, Sally left her child at her mother's home in the Mattapan neighborhood of Boston. She worked at her job that day until 9:04 P.M. Emma tried to telephone Sally Thursday evening, but there was no answer. She went to Sally's apartment on Friday morning and rang the doorbell, but there was no answer. Attempts to telephone Sally on Friday and Saturday were unsuccessful. Sally did not appear at her mother's home by noon on Friday, as planned, to pick up her son. Family members tried unsuccessfully to reach her by telephone.

On Sunday, March 25, Sally's uncle went to her apartment to see if she were there. He rang the doorbell, but received no answer. He telephoned police. A police officer met him at the apartment building. The officer obtained a key to Sally's apartment from the building superintendent. The police officer entered the apartment and saw Sally's body on the floor in front of him. She was on her back, naked from the waist down, and her pants had been pulled down to her ankles. The handle of a steak knife was protruding from her sternum. The blade of the knife, approximately four and five-eighths inches long, was inserted fully into the chest cavity. A somewhat circular bloodstain on her shirt surrounded the knife.

The cause of death was a stab wound to the chest, penetrating the heart and the left lung. There were a few recent but minor scrapes and bruises on her body. A pathologist was unable to determine the time of death.

The evidence supported the Commonwealth's theory that death occurred sometime between Thursday, March 22, 1990, at 9:04 P.M., when Sally left work, and Friday morning, March 23, when Emma tried to contact her by telephone and then went to her apartment. Sperm cells were detected in vaginal and rectal swabs taken from Sally's body. Because death had occurred while Sally was lying on her back, and because no sperm cells were found on the crotch area of her panties, death probably occurred

after intercourse and before Sally could pull up her clothes such that her panties would collect sperm cells draining from her body. Forensic evidence also indicated that the sperm cells found on the rectal swab probably had drained from the vagina after death. For this reason those sperm cells could be seen considerably longer than if they had drained from the anus, and for more than twenty-four hours after intercourse.

No useful fingerprints were found in Sally's apartment. There was no sign of forced entry, and the windows were closed. Robbery did not appear to be a motive, as nothing appeared to have been taken. Police obtained a blood sample from the father of Sally's child in August, 1990, and later obtained a blood sample from Sampson, but deoxyribonucleic acid (DNA) testing excluded both men as donors of the sperm fractions found in the vaginal and rectal swabs taken from Sally's body. In the course of their investigation, police tried to locate the defendant in 1990, but were unsuccessful. For nearly six years the case remained unsolved.

On May 31, 1996, two officers from the Boston police department's cold case squad interviewed the defendant.[2] The defendant was advised of the Miranda warnings, which he acknowledged. He indicated that he was willing to be interviewed. Officers asked him if he knew Sally. He said that he did not, and asked if they had a photograph of her. They showed him various photographs of Sally, her child, her apartment, and the exterior of her Huntington Avenue apartment building. In response to questions by officers the defendant said that he never had dated Sally or had sexual relations with her. He also said that he did not know her, that he never had seen her before, and that he never was inside her apartment.

The defendant smoked two cigarettes and drank a can of soda during the interview that were made available to him. At the end of the interview the defendant asked if his fingerprints had been found in the apartment. One of the officers said he did not know. The officers delayed answering the defendant's questions

[2]The jury were not told that the defendant was incarcerated at the Massachusetts Correctional Institution at Concord at the time of the interview. Physical evidence obtained during the interview is the subject of the discussion on suppression, *infra*.

about Sally's whereabouts until the end of the interview, when they told him she was dead.

The officers retrieved the two cigarette butts and the soda can that the defendant left behind. They submitted those items, a vaginal swab taken from Sally's body, and a known sample of Sally's blood to the Center for Blood Research (CBR) Laboratories for DNA testing. Using the DQ Alpha and the polymarker gene sites, involving a total of six genetic locations, CBR determined that the DNA profile of the female aspect of the vaginal swab matched that of the known sample of Sally's blood, and that the DNA profile of the male aspect of the vaginal swab matched the DNA profile of the cells left on the cigarette butts that the defendant smoked. Employing the DNA tests here, the probability that another African-American individual randomly selected from the population would have the same genetic profile as the defendant is one in 21,677.[3]

In May, 1997, the Commonwealth sent a known sample of the defendant's blood[4] to the Federal Bureau of Investigation (FBI) for DNA testing at four genetic locations against the rectal swab from Sally's body. The DNA from the blood sample matched the DNA profile of the male fraction of the swab. Employing the DNA testing here, the statistical likelihood of a matching profile in the African-American population is one in 100,000, one in 220,000 in the Caucasian population, one in 240,000 in the southeastern Hispanic population, and one in 24,000 in the southwestern Hispanic population.

On November 7, 1996, Emma identified a photograph of the defendant from an array of ten photographs as the person she had seen at Sally's apartment in February and March, 1990.

*2. Required finding.* The defendant argues that the evidence was not sufficient to support a finding of deliberate premeditation, and therefore his motion for a required finding of not guilty should have been allowed. *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-678 (1979). In particular, he contends that, although the evidence was sufficient to support a conviction of

---

[3]The defendant is African-American, as was the victim.

[4]The jury were not informed that in December, 1996, a grand jury requested a sample of the defendant's blood, and that, after a hearing, a judge authorized the Commonwealth to take a sample of the defendant's blood.

felony-murder, a theory of murder not submitted to the jury, there was no evidence that the killing was the product of cool reflection, required under the theory of deliberate premeditation. *Commonwealth* v. *Blaikie*, 375 Mass. 601, 605 (1978).

There is no particular period of reflection required for deliberate premeditation. "[I]n view of the quickness with which the mind may act, the law cannot set any limit to the time. . . . It is not so much a matter of time as of logical sequence. First the deliberation and premeditation, then the resolution to kill, and lastly the killing in pursuance of the resolution; and all this may occur in a few seconds." *Commonwealth* v. *Tucker*, 189 Mass. 457, 494-495 (1905).

Contrary to the defendant's suggestion, a single fatal blow does not preclude premeditation. See *Commonwealth* v. *Blaikie, supra* at 605-606 (single gunshot wound to back of head). Nor does a killing in the course of aggravated rape limit the Commonwealth to a conviction of murder in the first degree on the theory of felony-murder. See, e.g., *Commonwealth* v. *McNickles*, 434 Mass. 839, 840 (2001). There was no evidence of a relationship gone bad or other circumstances suggesting a sudden transport of passion or revenge. Indeed, the defendant claimed he did not know Sally and never had met her. There was no evidence that the killing occurred as a result of a struggle over property or any effort by Sally to protect her property from theft: nothing was stolen. The evidence suggests nothing frenzied about the stabbing. Rather, the location and depth of the single wound to the heart invite a finding that death not only was intended, but was delivered with measured certainty while Sally was lying on her back. The jury could have found that the defendant raped Sally at knife point (aggravated rape), then killed her to prevent her from identifying him to police. There was no error.

3. *Motion to suppress.* The defendant asserts error in the denial of his motion to suppress the butts of two cigarettes he smoked and the soda can from which he drank during his interrogation by police at the Massachusetts Correctional Institution at Concord (MCI Concord), as well as the fruits of that evidence, namely, all the DNA testing. The defendant contends that he had a reasonable expectation of privacy in the seized evidence, especially where he declined to give police a sample of his blood for DNA

testing. He contends there are prison rules that forbade him from taking the cigarette butts and soda can with him, and where the officers acknowledged a backup plan to make cigarettes and soda available to him to obtain his saliva sample for DNA testing in the event he declined to give a blood sample, his failure to remove the soda can and cigarette butts cannot be deemed an abandonment of the items seized for purposes of the Fourth and Fourteenth Amendments to the United States Constitution, or art. 14 of the Massachusetts Declaration of Rights.

The motion judge found that the officers brought cigarettes and soda to their interview with the defendant at MCI Concord on May 31, 1996, consistent with their standard procedure of relaxing the person being interviewed. During the interview the defendant requested a cigarette. He was given a fresh pack, which he opened. During the course of the interview he smoked two cigarettes and drank a can of soda. Before leaving the interview the defendant requested another cigarette. The officers gave him the balance of the pack of cigarettes. The institution had no policy or regulation prohibiting inmates from taking cigarettes from the interview room, including cigarette butts. However, the soda can could not have been removed by the defendant and taken back to his cell, as the Department of Correction would have considered it contraband — material from which a weapon could have been made. The officers remained in the room for about twenty minutes before removing the cigarette butts and empty soda can left by the defendant, in the event he had second thoughts about leaving the items behind. The judge found that the defendant abandoned the cigarette butts, and that he never had a reasonable expectation of privacy in the soda can.

The defendant does not challenge the judge's findings of fact. Instead, he relies on the undisputed testimony of the officers that he declined to give a blood sample, and that the officers had discussed among themselves that if he declined to give a blood sample, their fall-back plan would be to collect anything he discarded that might contain a biological sample suitable for DNA testing, such as a cigarette butt.

When reviewing the denial of a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error,

but we conduct an independent review of her ultimate findings and conclusions of law. *Commonwealth* v. *Correia*, 381 Mass. 65, 76 (1980). We may supplement the judge's subsidiary findings by uncontested testimony at the hearing given by a witness whose testimony largely was credited by the judge and does not contradict the judge's findings. See *Commonwealth* v. *Isaiah I.*, 448 Mass. 334, 337 (2007), *S.C.*, *ante* 818, 819 (2008), and cases cited.

The judge correctly determined that the cigarette butts had been abandoned by the defendant. Nothing prevented the defendant from bringing them with him after the interview had ended, as he had done with the balance of the pack of cigarettes. Whatever reasonable expectation of privacy he may have had in the cigarette butts was abandoned under both the State and Federal Constitutions. See *Commonwealth* v. *Pratt*, 407 Mass. 647, 660 (1990) (art. 14); *Commonwealth* v. *Chappee*, 397 Mass. 508, 512-513 (1986) (Fourth Amendment). See also *Commonwealth* v. *Bly*, 448 Mass. 473, 479-480 n.3, 490-491 (2007) (defendant failed to assert any expectation of privacy in cigarette butts and water bottle left behind in interview room at correctional facility). The defendant appears to have anticipated this analysis. The defendant's reliance on *Commonwealth* v. *Groome*, 435 Mass. 201, 218-219 (2001), a case involving the effect of some evidence of inducement on the validity of waiver of a constitutional right, for his claim that his waiver of the right to privacy was obtained by ruse, is misplaced. There was no inducement in exchange for the defendant's abandonment of the cigarette butts or the soda can. First, as the motion judge found, it was the defendant who asked for the cigarettes and the soda. Second, there was no evidence that the officers did anything to induce him to leave these items behind. For purposes of our analysis, the critical act is not the making available of cigarettes and soda, if requested. Rather, it is the abandonment of the cigarette butts and soda can, and the officers promised the defendant nothing in exchange for abandonment.

With respect to the soda can, the judge correctly found that the defendant did not have a reasonable expectation of privacy in that item, where he knew that he could not take it with him because guards at the institution reasonably would consider it contraband capable of being made into a weapon. We note that

the defendant made no attempt to sanitize the item or exert control over it, and therefore it, too, could be considered abandoned. There was no error.

4. *Evidentiary issues.* There is no merit to the defendant's claim that he was denied his constitutional right to present evidence in his own defense, see *Commonwealth* v. *Francis*, 375 Mass. 211, 213-214, cert. denied, 439 U.S. 872 (1978), when the trial judge, after a voir dire on the defendant's motion in limine, refused to allow defense counsel to question Emma about Sampson's pattern of violent conduct against her. The defendant argues now, as he did at trial, that this constituted third-party culprit evidence that was probative of his theory that Sampson killed Sally.

A defendant may offer third-party culprit evidence where "the acts of such other person are so closely connected in point of time and method of operation as to cast doubt upon the identification of [the] defendant as the person who committed the crime." *Commonwealth* v. *Keizer*, 377 Mass. 264, 267 (1979), quoting *State* v. *Bock*, 229 Minn. 449, 458 (1949). When a defendant offers such evidence and it is "of substantial probative value, and will not tend to prejudice or confuse, all doubts should be resolved in favor of admissibility." *Commonwealth* v. *Keizer, supra,* quoting *Holt* v. *United States*, 342 F.2d 163, 166 (5th Cir. 1965). We do not disturb a trial judge's decision to admit or exclude such evidence unless justice requires a different result. *Commonwealth* v. *Conkey*, 430 Mass. 139, 146 (1999), *S.C.*, 443 Mass. 60 (2004).

The judge determined that the evidence was too remote in time, and had insufficient probative value (particularly method of operation) to cast doubt on the identification of the defendant as the person who committed these crimes. We agree. Sampson's hostility toward Emma did not begin until the summer after they were married, and it lasted approximately six years. On one occasion he threatened her with a knife. He never displayed any hostility toward Emma while she lived with Sally, and he never demonstrated any hostility toward Sally. Sampson's abuse toward his wife was close in neither time nor place to Sally's death; Sampson was not involved in any close relationship with Sally as he was with his wife; and he only used a

knife (threateningly) on one occasion. This evidence does not have "substantial probative value" that Sampson killed Sally, and its use in evidence would have tended to confuse the jury into thinking, for purposes of this trial, any man with a history of violence who knew Sally could have killed her. It thus would have prejudiced the Commonwealth unfairly. There was no error in its exclusion from evidence.

The second and final evidentiary ruling at trial that the defendant asserts was erroneous involved Emma's description of Sally's voice as an anxious whisper when she telephoned Emma's parents' house one night in early March, 1990. The evidence was not offered for the truth of any matter asserted, and there was no testimony as to the substance of the conversation. The testimony was relevant to the nature of the relationship between Sally and the defendant, that is, that her voice became anxious when she was alone with him, and that their relationship in March, 1990, was one of neither friendship nor romantic involvement.

In his opening statement to the jury, defense counsel asserted that the evidence would show that Sally had not been raped, but that she had engaged in consensual sexual intercourse. The testimony in question was admitted properly as evidence to rebut a theory that Sally would have had consensual sexual intercourse with the defendant. See *Commonwealth* v. *Magraw*, 426 Mass. 589, 594 (1998) (murder victim's state of mind becomes material issue if defendant opens door by claiming defendant and victim on friendly terms). There was no error.

5. *First motion for a new trial.* In his first motion for a new trial the defendant alleged that a certain drug, Elavil, which had been prescribed for him by a physician at the Nashua Street jail, where he was held during trial, prevented him from testifying in his own behalf at trial and interfered with his ability to assist in his defense, thereby depriving him of his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. He also alleged that he complained to counsel about the effects of the medication but counsel failed to request any relief, such as a continuance, and thereby deprived him of the effective assistance of counsel under the Sixth and Fourteenth Amendments, and art. 12. The motion was accompanied by the defendant's affi-

davit. The trial judge had since retired, so the motion was heard by a different judge. After an evidentiary hearing at which the defendant, the prescribing physician, and a physician called by the defendant all testified, the motion judge denied the motion for a new trial.

A judge may grant a motion for a new trial "if it appears that justice may not have been done." Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001). Such motion "is addressed to the sound discretion of the judge." *Commonwealth* v. *Moore*, 408 Mass. 117, 125 (1990). On appellate review, the judge's "findings of fact after an evidentiary hearing on a motion for a new trial will be accepted if supported by the record." *Commonwealth* v. *Walker*, 443 Mass. 213, 224 (2005). We shall "examine the motion judge's conclusion[s] only to determine whether there has been a significant error of law or other abuse of discretion." *Commonwealth* v. *Grace*, 397 Mass. 303, 307 (1986). "When, as here, the motion judge did not preside at trial, we defer to that judge's assessment of the credibility of witnesses at the hearing on the new trial motion, but we regard ourselves in as good a position as the motion judge to assess the trial record." *Id.*

The motion judge found that the physician prescribed the dosage of twenty-five milligrams of Elavil for the defendant's headaches, to be taken daily before bedtime. That dosage is one-third the minimum suggested dose for ambulatory patients. Side effects of the drug include drowsiness, dizziness, fatigue, nausea, and dry mouth. On Saturday, January 15, 2000, after the fifth day of trial, the defendant received twenty-five milligrams of Elavil before bed. On Sunday, January 16, due to a nurse's error, he received fifty milligrams in the morning and twenty-five milligrams before bed. On Monday, January 17, Martin Luther King, Jr., day, and a court holiday, the defendant received no Elavil at bedtime. The judge expressly disbelieved the defendant's testimony that he received daily doses of fifty milligrams. The half-life of Elavil is approximately from twelve to fifteen hours, so the effects of the seventy-five milligrams he received January 16 largely would have dissipated by January 18.

The sixth day of trial began January 18, 2000. Just before the

luncheon recess the judge held a colloquy with the defendant concerning his right to testify. The judge informed the defendant that he had an absolute right to testify in his own behalf, that a decision not to testify could not be used against him, and that if he did testify the prosecutor would have the right to cross-examine him.[5] At no time did the defendant complain to the judge that his medication was interfering with his ability to decide. The defendant indicated he understood his right to testify, and the trial judge so found. The motion judge disbelieved the defendant's testimony that he could not testify because he was suffering from dry mouth, slurred speech, and confused thinking.

The motion judge found that, although the defendant had asked, through counsel, to be excused from the charge confer-ence because he had a "stomach ache," the defendant never complained to anyone, including trial counsel, about the side ef-fects of Elavil, and the defendant even admitted that he never asked trial counsel to communicate any physical problems to the trial judge. The motion judge also found that no one, includ-ing his expert witness, who is a physician, ever observed the de-fendant experiencing any of the side effects about which he now complains.

The motion judge found the defendant failed to sustain his burden of proof. Because her decision was based on a cred-ibility assessment of witnesses who testified at the hearing on the first motion for a new trial, and because her assessment of rele-vant trial events gleaned from the trial transcript are the same as ours, we conclude there was no error in the denial of the first motion for a new trial.

6. *Second motion for a new trial.* The defendant filed a second motion for a new trial on April 5, 2004. After an evi-dentiary hearing, the motion judge, who was not the same judge who heard the defendant's first motion for a new trial, found the following facts. In the late summer or early fall of 1999, while awaiting the start of the defendant's second trial, see note 5, *supra*, defense counsel was contacted by a representative from Lion Television Limited (Lion), a British television pro-duction company, who informed counsel that Lion was interested

---

[5]The defendant's first trial in March, 1999, ended in a mistrial because the jury were unable to reach a verdict. The defendant testified at that trial.

in filming the defendant's trial for a documentary that it was producing.[6] The representative told counsel that Lion had secured permission to film several trials in the Superior Court, a fact that counsel confirmed with the office of the Chief Justice for Administration and Management of the Trial Court.[7] After gathering more information from Lion about the details of the production, counsel met with the defendant and explained to him that there would be cameras in the court room and that, if the defendant consented, the parties would wear wireless microphones.[8] Counsel further explained to the defendant that the microphone worn by counsel would record their conversations, but that the microphone could be turned off if the defendant wanted to speak with him privately. In the alternative, counsel did not have to wear a microphone. Counsel told the defendant that Lion wanted to record everything, including court proceedings, strategy meetings, and conversations outside the court room. As a consequence, counsel explained to the defendant the potential impact of such

[6]The documentary aired in the United States in November, 2000, as part of the television show "Frontline," but the defendant's trial was not a focus of the program. The British version of the documentary was shown by the British Broadcasting Company, and it devoted a thirty-minute segment to the defendant's case. The programs were not broadcast until well after the conclusion of the defendant's trial, and the defendant has raised no specific claim that the jury's deliberations were affected by the filming. The raw footage used to create the Lion documentary eventually was given to Sean Flynn, a local author, who incorporated verbatim conversations between trial counsel and the defendant into his book, Boston Law: The True Story of a War on Crime.

[7]Supreme Judicial Court Rule 1:19, 428 Mass. 1301 (1998), provides that, subject to certain limitations, "[a] judge shall permit broadcasting, televising, electronic recording, or taking photographs of proceedings open to the public in the court room by the news media for news gathering purposes and dissemination of information to the public . . . ." Rule 1:19 (c) further provides that "[d]uring the conduct of a jury trial, a judge should not permit *recording* or close-up photographing or televising of bench conferences, conferences between counsel, *or conferences between counsel and client*" (emphasis added). See notes 9 & 15, *infra.*

[8]It was counsel's recollection, based on his initial conversations with Lion, that the defendant would wear a wireless microphone during his trial. Counsel subsequently learned, right before the commencement of trial, that the defendant would not be wearing a microphone. It was also counsel's understanding that all of the court personnel were going to be wearing wireless microphones. There is nothing in either the trial transcript or the transcript of the evidentiary hearing on the defendant's second motion for a new trial to indicate whether anyone apart from defense counsel actually wore a wireless microphone.

recordings on attorney-client confidences, and he cautioned the defendant that the recordings could be used against him at any subsequent proceedings. Defense counsel also informed the defendant that he could write down anything he wanted to communicate to counsel, and they could speak together when the defendant returned to lockup. After discussions about the whole matter, the defendant raised no objections to allowing Lion to film and record his trial.[9]

On January 7, 2000, defense counsel filed a motion in limine to exclude cameras from the court room on the grounds that their use would pose a serious threat of physical and emotional harm to the defendant, and would hamper a defense of mistaken identification. The motion was accompanied by an affidavit from counsel stating that he had informed representatives from Lion that the defendant refused to conduct any interviews and did not wish to have any cameras in the court room. On January 10, the trial judge denied the defendant's motion in limine without explanation.

The defendant's second trial commenced on January 10, 2000.[10] At the beginning of the fifth day, while stating that he knew "PBS cameras" were going to be present, the defendant objected to the presence of a still photographer from the Boston Globe. The judge ultimately prohibited the use of the Boston Globe still camera in the court room. In light of earlier advice from his attorney, the defendant used pen and paper to com-

---

[9]The only concern expressed by the defendant was his fear of reprisals from other inmates if the media published his image. Following the defendant's first trial, see note 5, *supra*, the defendant had to be transferred from one correctional facility to another due, in part, to threats he had received.

[10]In his testimony at the evidentiary hearing on the defendant's second motion for a new trial, counsel stated that he showed the defendant the wireless microphone on the first day of the defendant's second trial, and he reminded the defendant that the microphone could be turned off for private conversations. The defendant never signed a written release permitting counsel to wear a microphone because, according to counsel, the defendant did not have any concerns about the arrangement. Moreover, it was counsel's understanding that he could have objected to the wearing of a wireless microphone at any time, either on his own behalf or at the request of his client. While it is clear from the trial transcript that the judge was aware that Lion was producing a documentary that would include footage of the defendant's trial, we are unable to glean from the record whether the judge knew, in particular, that defense counsel would be wearing a microphone.

municate with counsel, and they had conversations about the microphone while the defendant was in lockup. During the trial, the defendant participated in one-on-one interviews with Lion outside the court room in which he commented on the criminal justice system, questioned law enforcement's delay in arresting him, explained how he remembered knowing the victim, and read passages from the Bible. Lion filmed a conversation outside the court room between counsel and the defendant where they discussed the defendant's innocence and the issue whether the defendant should testify on his own behalf. Lion also recorded conversations between counsel and the defendant at the defense table where they discussed the defendant's objection to the presence of the Boston Globe photographer in the court room and the issue whether the defendant should testify at trial. In addition, Lion recorded counsel's comment to a third party expressing relief that the defendant had decided not to testify because he would have been "slaughtered."

In his second motion for a new trial, the defendant claimed that he was denied the effective assistance of trial counsel in violation of his rights under the Sixth and Fourteenth Amendments and art. 12. The defendant asserted that counsel's agreement with Lion to wear a wireless microphone was made without his consent, created a conflict of interest, and violated the confidentiality of attorney-client communications by transmitting their conversations to third parties. As such, the defendant was deprived of his constitutional right to counsel. The defendant further claimed that this was a newly discovered issue because it was not until November, 2003, that the defendant and appellate counsel learned that counsel had worn a wireless microphone during trial.

The motion judge denied the defendant's second motion for a new trial. She concluded that an attorney's agreement to wear a microphone during trial and permit an intrusion into confidential attorney-client communications creates an actual conflict of interest as a matter of law. See *Commonwealth v. Downey*, 65 Mass. App. Ct. 547, 553 (2006). As such, the judge continued, the defendant's claim turned on whether his consent to such arrangement was voluntary, knowing, and intelligent. The judge found that trial counsel diligently and zealously protected the

defendant's rights by informing him, in detail, about Lion's production, about the use of wireless microphones, and about the potential disadvantages of the arrangement. The judge concluded that the defendant's contention that he was unaware of the filming until the first day of trial was belied by the fact that three days before the commencement of trial, counsel filed a motion in limine to exclude cameras from the court room, and the motion included information that only could have originated with the defendant. The judge concluded not only that the defendant expressly consented to the filming arrangement in a voluntary, knowing, and intelligent manner, but also that his conduct "was the functional equivalent of consent."

The defendant agrees with the motion judge's conclusion that when trial counsel wore a wireless microphone that transmitted attorney-client conversations to Lion, he created an actual conflict of interest. The defendant contends, however, that the Commonwealth failed to satisfy its burden of establishing that he knowingly, intelligently, and voluntarily waived the conflict of interest. The defendant argues that he did not consent to counsel's wearing of a microphone because he was not adequately informed about the potential consequences of such an arrangement and the impact the microphone could have on the quality of counsel's representation and legal advice. Moreover, the defendant continues, it was the judge's order denying his motion in limine, not the defendant's consent, that allowed Lion's filming and recording to proceed. We conclude that, in a well-reasoned decision, the motion judge properly denied the defendant's second motion for a new trial, and that the record does not support the defendant's position.

"The Sixth Amendment to the United States Constitution and art. 12 of the Declaration of Rights entitle a defendant to the effective assistance of counsel." *Commonwealth* v. *Martinez*, 425 Mass. 382, 387 (1997). See *Commonwealth* v. *Hodge*, 386 Mass. 165 (1982). "[A] defendant must be able to seek the advice and guidance of his attorney and must be able to rely on the undivided loyalty of his counsel to present the defense case with full force and zealousness." *Commonwealth* v. *Downey*, *supra* at 551-552. See *Commonwealth* v. *Davis*, 376 Mass. 777, 780-781 (1978) ("A defendant is entitled to the untrammeled

and unimpaired assistance of counsel free of any conflict of interest and unrestrained by commitments to others").

"It is axiomatic that among the highest duties an attorney owes a client is the duty to maintain the confidentiality of client information."[11] *Commonwealth* v. *Downey*, 58 Mass. App. Ct. 591, 596 (2003), *S.C.*, 65 Mass. App. Ct. 547 (2006). A conflict of interest arises whenever an attorney's regard for one duty, such as that owed to a third party or in service of his own interests, leads the attorney to disregard another duty, such as that owed to his client. See *Commonwealth* v. *Goldman*, 395 Mass. 495, 503, cert. denied, 474 U.S. 906 (1985), and cases cited. The general rule on conflicts of interest between an attorney and his client, Mass. R. Prof. C. 1.7, 426 Mass. 1330 (1998), states, in pertinent part:

> "(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

> "(1) the lawyer reasonably believes the representation will not be adversely affected; and

> "(2) the client consents after consultation. . . ."

"Loyalty to a client is . . . impaired when a lawyer cannot consider, recommend or carry out an appropriate course of action for the client because of the lawyer's other responsibilities or interests. The conflict in effect forecloses alternatives that would otherwise be available to the client." Comment [4] to rule 1.7. The critical inquiry is whether the lawyer has a competing interest or responsibility that "will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reason-

---

[11]An attorney's duty of confidentiality, with certain exceptions, is embodied in Mass. R. Prof. C. 1.6 (a), 426 Mass. 1322 (1998), which states that "[a] lawyer shall not reveal confidential information relating to representation of a client unless the client consents after consultation . . . ." The language of this rule makes clear that an attorney's duty of confidentiality is not absolute, particularly in those circumstances where disclosure is authorized by the client. See *Commonwealth* v. *Downey*, 58 Mass. App. Ct. 591, 597-598 (2003), *S.C.*, 65 Mass. App. Ct. 547 (2006).

ably should be pursued on behalf of the client."[12] *Id.* We add that "[c]onsideration should be given to whether the client wishes to accommodate the other interest involved." *Id.* "Resolving questions of conflict of interest is primarily the responsibility of the lawyer undertaking the representation."[13] Comment [15] to rule 1.7. In accordance with Mass. R. Prof. C. 1.4 (b), 426 Mass. 1314 (1998), "[a] lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." There is no requirement that an attorney use "magic words" to explain a conflict of interest as long as the client is fully advised of the import and ramifications of any such conflict.

Our case law has distinguished between actual and potential conflicts of interest. "An 'actual' or 'genuine' conflict of interest arises where the 'independent professional judgment' of trial counsel is impaired, either by his own interests, or by the interests of another client." *Commonwealth* v. *Shraiar*, 397 Mass. 16, 20 (1986). See *Commonwealth* v. *Croken*, 432 Mass. 266, 272 (2000), and cases cited. It is the defendant's burden to present "demonstrative proof detailing the precise character of the alleged conflict of interest." *Commonwealth* v. *Davis*, *supra* at 781. Mere speculation or conjecture is insufficient. See *id.* A genuine conflict of interest can be shown either "by reference to the trial record, or by evidence extrinsic to court proceedings." *Id.* See *Commonwealth* v. *Martinez*, *supra* at 390. "If a defendant demonstrates an actual conflict of interest, art. 12 does not

---

[12]Comment [6] to Mass. R. Prof. C. 1.7, 426 Mass. 1330 (1998), states that "[t]he lawyer's own interests should not be permitted to have an adverse effect on representation of a client." There is no evidence in the record that trial counsel received any financial compensation from Lion for his participation in the documentary. It is certainly possible that after the documentary was shown on television, it could have generated publicity that benefited counsel's legal practice. We have no way of ascertaining whether that occurred. Based on our review of the trial transcripts, there is no indication that counsel used anything but his best efforts to exonerate the defendant.

[13]In his testimony at the evidentiary hearing on the defendant's second motion for a new trial, counsel stated that it was his understanding that the burden would be on him or on the defendant to turn off the wireless microphone. We point out that it is not within the realm of the defendant's expertise to know when it would be appropriate for the microphone to be silenced. That is why a defendant has an attorney — to advise him when his interests could be compromised and to take all necessary steps to protect his rights.

require the defendant to show that the conflict resulted in actual prejudice or that it had an adverse effect on his counsel's performance."[14] *Commonwealth* v. *Fogarty*, 419 Mass. 456, 459 (1995). See *Commonwealth* v. *Croken*, *supra*. Once an actual conflict of interest has been established, the defendant's conviction must be reversed unless, as discussed below, the client has waived the conflict. See *Commonwealth* v. *Martinez*, *supra* at 389-394; *Commonwealth* v. *Shraiar*, *supra*. On the other hand, "where a defendant can show nothing more than a potential conflict [of interest], the conviction will not be reversed except on a showing of actual prejudice." *Commonwealth* v. *Fogarty*, *supra*.

In those instances where an actual conflict of interest is established, the defendant "may consent to continued representation by his attorney 'so long as his consent is voluntarily, knowingly, and intelligently made.' " *Commonwealth* v. *Martinez*, *supra* at 392, quoting *Commonwealth* v. *Goldman*, *supra* at 498. "The ability to waive the right to a conflict-free attorney arises from (1) a criminal defendant's right to present his defense, with its corollary right of self-representation, and (2) his right to be represented by counsel of choice."[15] *Commonwealth* v. *Goldman*, *supra* at 505. "Because '[c]ounsel's undivided

[14]"Our standard for conflict of interest claims under the Massachusetts Declaration of Rights diverges from the Federal constitutional standard, under which the defendant must prove *both* an actual conflict of interest, and an adverse effect on the lawyer's performance" (emphasis added). *Commonwealth* v. *Shraiar*, 397 Mass. 16, 20 n.3 (1986), citing *Cuyler* v. *Sullivan*, 446 U.S. 335 (1980). Thus, a defendant's right to conflict-free assistance of counsel is afforded greater protection under art. 12 of the Massachusetts Declaration of Rights than under the Federal Constitution.

[15]A defendant's right to counsel of his own choosing is not absolute, and, in some circumstances, "the necessities of sound judicial administration require the court to take command of the situation." *Commonwealth* v. *Connor*, 381 Mass. 500, 503 (1980), quoting *United States* v. *Bernstein*, 533 F.2d 775, 778 (2d Cir.), cert. denied, 429 U.S. 998 (1976). "A judge therefore must have some discretion to disqualify a conflict-burdened attorney when the conflict might well restrict or prevent counsel's fulfilment of his role. A judge would be hampered in the exercise of his constitutional duties if he could not act to protect counsel's vital function. Such power is 'to be exercised sparingly and when the need is apparent and pressing and only after careful consideration, but with the power goes the duty to exercise it on proper occasions.' " *Commonwealth* v. *Connor*, *supra*, quoting *Collins* v. *Godfrey*, 324 Mass. 574, 579 (1949). In essence, "a trial judge has the power to protect the judicial system

loyalty to the client is crucial to the integrity of the entire adversary system,' . . . this waiver by the defendant must be clear and unambiguous." *Commonwealth* v. *Martinez, supra,* quoting *Commonwealth* v. *Goldman, supra* at 508.

As an initial matter, we point out that there is no doubt that trial counsel's participation in the documentary produced by Lion was fraught with peril, both for counsel and for his client. We agree with the motion judge that counsel's arrangement with Lion to wear a wireless microphone during trial, and thereby permit an intrusion into confidential attorney-client communications, created an actual conflict of interest. On the one hand, counsel had a duty to give undivided loyalty to and zealous representation of his client. On the other hand, counsel assumed the obligation of wearing a wireless microphone and giving third parties seemingly unfettered access to his confidential relationship with the defendant. These competing responsibilities created an actual conflict of interest for counsel, and the defendant was not required to show, pursuant to art. 12, that the conflict resulted in actual prejudice or that it had an adverse effect on counsel's performance. Our analysis, however, does not end here, because the success of the defendant's claim turns on whether he gave voluntary, knowing, and intelligent consent to counsel's arrangement with Lion in a manner that was clear and unambiguous. We conclude that he did.

At the evidentiary hearing on the defendant's second motion for a new trial, both counsel and the defendant testified about the nature of the Lion arrangement. "We do not disturb the factual findings of the motion judge unless they are clearly erroneous, and we must defer to [her] assessment of witness credibility." *Commonwealth* v. *Healy,* 438 Mass. 672, 676-677 n.6 (2003). The judge here credited counsel's testimony about the substance of his conversations with the defendant, concluding that counsel zealously and diligently protected the defendant's rights by informing the defendant, in detail, about the Lion production and its potential disadvantages. The judge found that counsel employed various safeguards to minimize

---

from 'manipulative behavior' by a defendant who purports to elect a waiver but wishes to preserve the conflict issue for appeal." *Commonwealth* v. *Goldman,* 395 Mass. 495, 506 n.12, cert. denied, 474 U.S. 906 (1985).

any detrimental effects of the filming, and the defendant took advantage of several of these safeguards. The judge pointed out that, during the trial, the defendant voluntarily participated in one-on-one interviews with Lion outside the court room. Moreover, the judge simply did not believe the defendant's claims that he was unaware of Lion's documentary project until the first day of trial, and that he was not advised of the possible consequences of the recording. The judge properly determined that the defendant clearly and unequivocally consented to trial counsel's conflict of interest in a voluntary, knowing, and intelligent manner. As such, we conclude that the defendant was not denied the effective assistance of counsel in violation of his constitutional rights.[16]

The defendant takes issue with the fact that counsel did not initiate a colloquy with the trial judge about the use of the wireless microphone, and the judge took no steps to ensure that privileged conversations remained private. Comment [15] to rule 1.7 states that "[i]n litigation, a court *may* raise the question [whether there exists a conflict of interest] when there is reason to infer that the lawyer has neglected the responsibility" (emphasis added). Counsel did not request a colloquy because, after having fully explained to the defendant the implications of Lion's request, the defendant expressed no objections to the arrangement. There is nothing in the record to suggest that the judge had any reason to believe that counsel had neglected his

---

[16]We have stated that pursuant to art. 12, the existence of an actual conflict of interest obviates the requirement that a defendant prove specific prejudice. See *Commonwealth* v. *Martinez*, 425 Mass. 382, 388 (1997). Although our review of this issue in the present case makes no inquiry into prejudice, our independent review under G. L. c. 278, § 33E, is broader than the jurisprudence of conflict of interest. Under § 33E, we review to determine whether counsel's wearing of the wireless microphone created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Ciampa*, 406 Mass. 257, 268 (1989). *Commonwealth* v. *Callahan*, 380 Mass. 821, 822-826 (1980). Pursuant to our review under § 33E, we conclude that it did not. The defendant was represented aggressively by counsel, and it appears that nothing resulted from counsel's wearing of the wireless microphone that likely affected the verdict. That said, we are deeply troubled by defense counsel's arrangement with Lion to wear a wireless microphone during trial, the implications of which go to the heart of the confidential relationship between a defendant and his attorney. Counsel never should have agreed to this arrangement in the first instance, and, were it not for the defendant's voluntary, knowing, and intelligent consent to the conflict of interest, a new trial might be necessary.

responsibilities to his client, notwithstanding the defendant's objection to the presence in the court room of a still photographer from the Boston Globe, which was properly brought to the judge's attention and appropriately handled.

We reiterate the importance of trial judges being vigilant about conflicts of interest, particularly of the unusual sort implicated here, and initiating a colloquy with counsel addressing the matter where appropriate. While such a course of action is not constitutionally mandatory, it constitutes the best practice for ensuring a client's consent to his attorney's conflict of interest and for helping to shield convictions from subsequent claims of ineffective assistance of counsel. See *Commonwealth* v. *Davis*, 376 Mass. 777, 784-785 (1978). See also *Wheat* v. *United States*, 486 U.S. 153, 161 (1988). We have concluded, in specific circumstances, that it is incumbent on a trial judge to ascertain that a defendant is adequately informed of the risks of particular conflicts of interest. See *Commonwealth* v. *Martinez*, *supra* at 392-393 (colloquy required where defense counsel represented prosecution witness in another matter); *Commonwealth* v. *Connor*, 381 Mass. 500, 506 (1980) (judge should hold colloquy where conflict of interest arises from defense counsel's past or present representation of prospective witnesses); *Commonwealth* v. *Davis*, *supra* at 784 ("the trial court's obligation to ensure a fair and impartial trial will include an affirmative duty to assure that each defendant is adequately informed of the risks and potential dangers of joint representation and that each acknowledges an understanding of this information").[17] See also Comment [15] to rule 1.7 ("In a criminal case, inquiry by the court is generally required when a lawyer represents multiple defendants"). We decline to impose a mandatory obligation on trial judges to hold a colloquy in *all* instances when a conflict of interest may exist. Here, the lack of a colloquy was not fatal where our review under G. L. c. 278, § 33E, does not suggest

---

[17]In *Commonwealth* v. *Davis*, 376 Mass. 777, 786 (1978), this court further stated that "[w]hen a satisfactory inquiry is absent from the record, the Commonwealth will bear the burden of demonstrating by a preponderance of the evidence that prejudice to the defendant was improbable." However, we declined to "follow a rule that mandates reversal whenever the court's affirmative inquiry is missing from the record." *Id.* at 786 n.10, citing *Campbell* v. *United States*, 352 F.2d 359, 361 (D.C. Cir. 1965).

that the defendant suffered any prejudice from counsel's arrangement with Lion to wear a wireless microphone, and there was sufficient credible evidence to show that the defendant waived the conflict of interest.

7. *Review under G. L. c. 278, § 33E.* We have reviewed the transcripts, the briefs, and the entire record, and conclude that there is no reason to reduce the convictions or grant a new trial.

*Judgments affirmed.*

*Orders denying motions for
a new trial affirmed.*