[No. C061749. Third Dist. Nov. 22, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
ROLANDO N. GALLEGO, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts II. through V. of the Discussion.

## COUNSEL

Ralph H. Goldsen, under appointment by the Court of Appeal, for Defendant and Appellant.

Michael T. Risher for ACLU of Northern California as Amicus Curiae on behalf of Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, David A. Rhodes and Daniel B. Bernstein, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BUTZ, J.**—A jury acquitted defendant Rolando N. Gallego of first degree murder but convicted him of a 1991 second degree murder and found he used a knife to commit it. (Pen. Code, former §§ 187, 12022, subd. (b)(1).)[1]

Sentenced to a state prison term of 16 years to life, defendant appeals. He contends (1) DNA[2] testing should be deemed a constitutionally protected "search," regardless of the source of the tested material; and, the trial court (2) coerced a guilty verdict after a second deadlock and abused its discretion in denying the release of juror information; (3) erroneously instructed on an alleged false statement from him; (4) erroneously admitted hearsay evidence and excluded his polygraph willingness; and (5) erred regarding presentence conduct credit and a parole revocation fine.

We agree with defendant's last contention regarding presentence conduct credit and the parole revocation fine, but disagree with his remaining claims. Of note, we conclude that a cigarette butt that defendant voluntarily discarded by tossing it onto a public sidewalk, which was then collected and DNA tested by law enforcement only to identify defendant as a suspect in an ongoing criminal investigation, did not constitute a search under the Fourth Amendment to the federal Constitution. Defendant had no reasonable expectation of privacy in this discarded item.

### FACTUAL BACKGROUND

The victim was Leticia Estores, defendant's aunt and godmother. She was killed in 1991. Defendant had been one of a few "persons of interest" to law enforcement at that time, but the primary evidence against him was not developed until 2006; that year, his DNA was discovered on a towel that had been collected at the crime scene (the towel contained several apparent bloodstains).

*The 1991 Murder of Leticia Estores*

On August 29, 1991, at 7:00 p.m., Estores, along with a coworker, locked up the hair salon at which they worked; the two planned to see each other again at work the next morning.

---

[1] Undesignated statutory references are to the Penal Code.

[2] DNA is the acronym for deoxyribonucleic acid, pursuant to section 295 et seq., and the DNA and Forensic Identification Database and Data Bank Act of 1998, as amended (DNA Act).

Uncharacteristically, Estores did not show up that next morning (Aug. 30); nor did she call. At 1:47 p.m. that afternoon, the police checked on Estores at her home. Getting no response, an officer went inside through the unlocked front door. He found Estores lying in a pool of blood on the kitchen floor. The officer also noticed a bloody towel on the floor near the front door; the television, as well as some lights, were on; there were no signs of forced entry; and the house was very neat. Reputedly, Estores was cautious about opening her front door to strangers.

Crime scene investigators collected an apparently cleaned kitchen knife in the kitchen sink, the broken tip of which was found embedded in Estores's wrist. Although the house was not ransacked, it appeared that someone had gone through drawers in the bedrooms, including the master bedroom, because several items of neatly folded clothing had been flipped over. Estores's husband George testified that his wife kept $1,000 in cash in a shoe box in their bedroom closet.[3] Neither that money, nor anything else of value, however, was taken from the house.

An autopsy of Estores disclosed that she had been stabbed and cut at least 50 times, all over her body, including one just below her eye that pierced her brain stem. The pathologist said the time of death could have been between 9:00 and 11:00 p.m., but this time could not be determined with certainty.

*Defendant's Statements to Police*

In the fall of 1991, Detective Richard Lauther asked defendant where he was on the night of August 29, 1991. Defendant replied that he was at his restaurant job (the Capital Towers), and he gave Lauther his employer's phone number; after work, defendant said, he went home and got into bed with his wife. Lauther did not have any documentation of this statement from defendant. Lauther called defendant's employer and asked whether defendant had been at work on August 29, 1991. The employer's response prompted Lauther to want to speak with defendant again.

Subsequently, on November 12, 1991, Detective Lauther and his partner, Detective Robert Risedorph, interviewed defendant at defendant's residence, which was about a mile from Estores's house. Defendant told the detectives that on the night of the murder, he was gambling at the Eldorado Hotel

---

[3] George Estores worked and resided in the Bay Area during the week.

Casino in Reno. He said he had called his employer that day and told him he could not come to work because he was going to visit his sick grandmother. (The defense subsequently elicited testimony from Lauther that when he checked with defendant's restaurant employer, he was told that defendant had called in sick that day.) Defendant did not tell his wife about his gambling plans because the subject caused friction between them. Defendant added that he used cash to pay for all his expenses on the trip, including gas. He did not think any casino employee would remember him being there.[4]

Defendant admitted to the detectives that he had a gambling problem, that he gambled in Reno frequently, that he owed gambling debts to several people (including $4,000 to his Uncle Paul), that he was still gambling in an attempt to pay his debts, and that he was having trouble making his mortgage payments. Defendant also said he once borrowed $40 from Estores in June 1991 to stay at a hotel after his wife kicked him out for gambling.

Defendant told Detectives Lauther and Risedorph that he last saw Estores the Sunday night before her death; he was at her house for about an hour watching a movie with her husband. Defendant said he had been to Estores's home a few times before then, but had never spent the night there (although he showered there once in June 1991). He denied that he had ever cut himself while in her house.

In July 2006, defendant was reinterviewed by Detectives Grant Stomsvik and Ted Voudouris. Defendant repeatedly denied having anything to do with Estores's murder. He stated, however, that he spent the night at Estores's house two weeks before her death while Estores's then 17-year-old son Christian and his girlfriend were staying there (in Aug. 1991, defendant was 32 years old; Christian testified he could not recall ever seeing defendant at his mother's house). Defendant also acknowledged filing for bankruptcy, apparently in the early 1990's.

*Gambling Debts to Family Members*

Antonio (Tony) Concepcion, a distant relative of defendant's, and Tony's wife Priscila testified that about a week before Estores was killed, they loaned

---

[4] Robert MacKay worked at the Eldorado Hotel Casino in Reno in 1991 as director of finance, and still worked there in 2009 as director of administration and internal audit. MacKay testified that in 1991, the casino had a video security system that erased itself every two or three days. Also, in 1991, the casino issued "Gold Cards" to regular customers so they could accumulate points and receive complimentary benefits; defendant had been issued such a card in 1991, but did not use it on August 29, 1991.

defendant $5,000 to pay off gambling debts; but they refused to loan defendant another $5,000 a few days later when he said he had lost the first $5,000 gambling. Defendant also asked Tony to intercede on his behalf with another family member (Eugene Amador) to borrow money.

An aunt of defendant's, Primitiva Madayag, testified that about a week before Estores was killed, she and her husband had loaned defendant $2,000 upon defendant's request.

*Forensic Evidence*

In December 1993 and September 1994, the Sacramento County crime lab, through criminalist Dolores Dallosta (with review by her supervisor, Mary Hansen), conducted forensic tests on the apparently bloodstained 15-inch by 23-inch kitchen towel found at the crime scene. Eighteen different areas of the towel contained what could be bloodstains (by color). Three types of tests disclosed that, at the least, five stained areas contained human blood (the storage of the towel for two years in an unventilated warehouse could have adversely affected the number of blood findings).

In April 2006, another criminalist at the Sacramento County crime lab, Joy Viray, conducted DNA testing on three of the five stained areas of the towel that had tested positive for human blood. (Preliminarily, Viray performed a presumptive blood test on these areas and obtained positive results; a confirmatory test, however, showed negative results, which Viray explained could have happened given the age of the sample, as the confirmatory test requires the stain to go into solution.) The DNA testing revealed a male DNA profile that had similarities to Estores's DNA, suggesting the male was related to Estores.

This DNA testing caused renewed interest in defendant. In May 2006, police surreptitiously obtained a sample of defendant's DNA by following him and then collecting a cigarette butt he had discarded on a public sidewalk. Defendant's DNA on the cigarette butt matched the male DNA on the three human-blood-tested areas of the towel.

At trial, defendant did not dispute that his DNA was on the kitchen towel. He disputed that his blood was the DNA contributor; instead, he argued, he had inadvertently wiped sweat, saliva or mucus on the towel on an earlier occasion, and that substance got mixed together with bloodstains from meat.

Defendant presented test results from a forensic serologist, Gary Harmor, which supported this theory. These tests showed the absence of human blood (pursuant to a relatively new type of test; although Harmor's presumptive blood tests were all positive), and the presence of cow or sheep blood on the towel as well as human saliva.

The prosecution countered this testimony with test results from county criminalists and with expert testimony from a University of California at Davis professor of meat science (specializing in meat processing). This evidence showed that liquid in packages containing store-bought beef and lamb does not test positive for human blood, and that there is almost no blood at all in these packages after slaughter and processing (the red liquid in a meat package is about 99 percent water, and the rest is almost entirely myoglobin, a red pigment in muscle tissue that is distinct from hemoglobin, which is present in blood).

*Other Suspects*

The prosecution anticipated and rebutted a third party culpability defense that Estores's husband George or her son Christian had a motive to kill her because they benefitted from a $100,000 life insurance policy payout; and that George was mad at her for visiting her former husband during a recent trip to the Philippines. George and Christian testified they were in the Bay Area on the night of the murder, and these alibis were corroborated.

## DISCUSSION

I. *The Fourth Amendment and the DNA Testing of the Discarded Cigarette Butt*

Defendant contends his constitutional Fourth Amendment right to be free from unreasonable searches was violated by the DNA testing of his discarded cigarette butt that generated his DNA profile, and the trial court erroneously denied his motion to suppress this evidence. Defendant's concern is not with the surreptitious collection of the cigarette butt by the police, but with their DNA testing of that cigarette butt. He argues that no one reasonably expects that the government will conduct warrantless, suspicionless testing of bodily fluids to generate a DNA profile, a profile that contains a wealth of private information including medical conditions and familial relations.

As we shall explain, we conclude the trial court properly denied defendant's motion to suppress. Defendant abandoned the cigarette butt by voluntarily discarding it on a public sidewalk. The facts show the DNA testing here was done only to identify defendant as a suspect in an ongoing criminal investigation. Under these circumstances, defendant did not have a reasonable expectation of privacy in the DNA testing of the cigarette butt; consequently, that testing did not constitute a search for Fourth Amendment purposes.

The Fourth Amendment to the federal Constitution provides "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." (U.S. Const., 4th Amend.)

■ Government activity constitutes a "search" for Fourth Amendment purposes only if the person claiming an illegal search exhibits an actual (i.e., subjective) expectation of privacy in the item searched, and that expectation is one society recognizes as reasonable (i.e., objectively). (*California v. Ciraolo* (1986) 476 U.S. 207, 211 [90 L.Ed.2d 210, 215, 106 S.Ct. 1809]; *Katz v. United States* (1967) 389 U.S. 347, 360–361 [19 L.Ed.2d 576, 588, 88 S.Ct. 507] (conc. opn. of Harlan, J.).)

It is well settled that a warrantless examination of property abandoned in public does not constitute an unlawful search under the Fourth Amendment, because a person has no reasonable expectation of privacy in such property. (*People v. Parson* (2008) 44 Cal.4th 332, 345 [79 Cal.Rptr.3d 269, 187 P.3d 1].) For example, in *California v. Greenwood* (1988) 486 U.S. 35 [100 L.Ed.2d 30, 108 S.Ct. 1625] (*Greenwood*), the United States Supreme Court concluded that the defendants there possessed no reasonable expectation of privacy in trash bags they had left at the public curb, which contained incriminating evidence of their narcotics trafficking. (486 U.S. at pp. 37–41 [100 L.Ed.2d at pp. 34–37].) Even though the police intercepted garbage bags intended for city collection, these defendants could not complain because they had left the items in a place "particularly suited for public inspection." (*Greenwood*, at pp. 37, 40–41 [100 L.Ed.2d at pp. 34, 36–37].)

■ Here, defendant voluntarily discarded his cigarette butt by tossing it onto a public sidewalk. That cigarette butt, like the trash bags in *Greenwood*, was left in a place "particularly suited for public inspection." Defendant thus abandoned the cigarette butt in a public place, and therefore had no reasonable expectation of privacy concerning the DNA testing of it to identify him

as a suspect in a criminal investigation. (See *Commonwealth v. Perkins* (2008) 450 Mass. 834 [883 N.E.2d 230, 239] [the defendant abandoned any privacy interest in cigarette butts and soda can he left behind after interview with police and later DNA tested]; *Commonwealth v. Bly* (2007) 448 Mass. 473 [862 N.E.2d 341, 356–357] [same]; *Commonwealth v. Cabral* (2007) 69 Mass.App.Ct. 68 [866 N.E.2d 429, 433] [the defendant, who spat on a public sidewalk, had no reasonable expectation of privacy in this saliva, or in DNA evidence derived therefrom]; accord, *Piro v. State* (Ct.App. 2008) 146 Idaho 86 [190 P.3d 905, 909–910]; see also *People v. LaGuerre* (N.Y.App.Div. 2006) 29 A.D.3d 820, 822 [815 N.Y.S.2d 211, 213] [police obtained DNA sample from piece of chewing gum the defendant voluntarily discarded during a contrived soda tasting test]; *State v. Athan* (2007) 160 Wn.2d 354 [158 P.3d 27, 33–34] [the defendant had no reasonable expectation of privacy in saliva he used to seal an envelope mailed to detectives in a police ruse, from which detectives obtained a DNA profile]; but see *State v. Reed* (2007) 182 N.C. App. 109 [641 S.E.2d 320, 321–323] [the defendant's 4th Amend. rights were violated when a detective kicked the defendant's cigarette butt off his patio to a common area, where it was retrieved by another detective].)

Defendant, joined by amicus curiae American Civil Liberties Union of Northern California (ACLU), argues that two factors render the concept of abandonment inapplicable to DNA testing.

First, they argue, the concept of abandonment encompasses an act of volition—of knowingly exposing the item to public view; this activity is missing in depositing DNA. As one commentator has colorfully put it, "[D]epositing DNA in the ordinary course of life when drinking, sneezing, or shedding hair, dandruff, or other cells differs from placing private papers in a container on the street to be collected as garbage. Depositing paper in the trash is generally a volitional act . . . . Leaving a trail of DNA, however, is not a conscious activity." (Imwinkelried & Kaye, *DNA Typing: Emerging or Neglected Issues* (2001) 76 Wash. L.Rev. 413, 437, fns. omitted; see also Joh, *Reclaiming "Abandoned" DNA: The Fourth Amendment and Genetic Privacy* (2006) 100 Nw. U. L.Rev. 857, 867, fns. omitted ["Do we intend to renounce our actual expectations of privacy with respect to this genetic material when we shed our DNA? The volition that is implied in abandonment is simply unrealistic here."].)

Here, though, defendant engaged in a conscious activity—indeed, an unlawful act of littering: voluntarily discarding his cigarette butt onto a public sidewalk. We do not face the situation of DNA being deposited in a truly

nonvolitional way of unconsciously shedding cells. While defendant may not have reckoned that the police would DNA test his cigarette butt, the *Greenwood* defendants did not reckon that the police would rifle through their garbage for incriminating evidence either. (See *Greenwood, supra*, 486 U.S. at pp. 39–40 [100 L.Ed.2d at pp. 36–37].) Moreover, our society has become increasingly aware of the reach of DNA testing from accounts in the mass media over these past many years.

And this first factor leads us to defendant's second factor, and to the critical issue of DNA *testing* here as an unlawful search. As defendant and amicus curiae point out, a DNA test, unlike, say, garbage or fingerprints, has the potential to reveal a treasure trove of personal information to others. But the facts here show that testing of defendant's DNA was done only for the purpose of identifying defendant as a suspect in an ongoing criminal investigation. (See also § 295 et seq. [California's DNA Act, which mandates warrantless DNA samples from felony offenders and arrestees, limits disclosure of DNA test results and samples to law enforcement personnel, limits the use of that information to identification purposes only, and sets forth criminal penalties for use other than this purpose]; see §§ 299.5, subd. (f), 295.1, subd. (a), 299.5, subd. (i)(1)(A), respectively.)

By voluntarily discarding his cigarette butt on the public sidewalk, defendant actively demonstrated an intent to abandon the item and, necessarily, any of his DNA that may have been contained thereon. The facts here show the DNA testing of the abandoned cigarette butt was carried out only to identify defendant as a suspect in an ongoing criminal investigation. On these facts, we conclude that a reasonable expectation of privacy did not arise in the DNA test of the cigarette butt, and consequently neither did a search for Fourth Amendment purposes. (See *United States v. Davis* (D.Md. 2009) 657 F.Supp.2d 630, 649–650.)

These facts also serve to distinguish the present case from two United States Supreme Court decisions cited by defendant for the proposition that an examination or an analysis (i.e., a test) of an item already lawfully in the possession of authorities may nevertheless constitute an additional intrusion into reasonable privacy interests and therefore be an independent "search" under certain circumstances: *Arizona v. Hicks* (1987) 480 U.S. 321 [94 L.Ed.2d 347, 107 S.Ct. 1149] (*Hicks*) and *Skinner v. Railway Labor Executives' Assn.* (1989) 489 U.S. 602 [103 L.Ed.2d 639, 109 S.Ct. 1402] (*Skinner*).

In *Hicks*, the high court concluded that the act of moving an item of stereo equipment to see a serial number that was not in plain sight—by a police officer lawfully on the premises on an unrelated matter—constituted an "additional invasion" of the defendant's privacy interest and therefore an independent "search" requiring Fourth Amendment justification. (*Hicks, supra*, 480 U.S. at pp. 324–325 [94 L.Ed.2d at pp. 353–354].)

*Skinner* proceeded from *Hicks*. Relevant to the situation before us, *Skinner* involved the issue of bodily fluids testing implicating Fourth Amendment privacy interests: federal safety regulations that compelled the provision of blood samples from railroad employees to determine drug use. For our purposes, *Skinner* concluded that "[t]he ensuing chemical analysis of the sample to obtain physiological data is a *further invasion* [i.e., in addition to the compelled drawing of the sample] of the tested employee's privacy interests." (*Skinner, supra*, 489 U.S. at p. 616 [103 L.Ed.2d at p. 659], italics added.) "[Thus,] the collection *and* subsequent analysis of the requisite biological samples must be deemed Fourth Amendment search*es* . . . ." (*Id.* at p. 618 [103 L.Ed.2d at p. 660], italics added.) As explained above, however, the ensuing analysis here (i.e., the DNA testing) was not done to "obtain physiological data," but only to identify a particular person in an ongoing criminal investigation.

In light of defendant's abandonment of the cigarette butt on a public sidewalk and the fact that the DNA testing of that cigarette butt was done only to identify him as a suspect in an ongoing criminal investigation, we are left, in the end, with the following rhetorical observation. What if the police here, instead of testing the cigarette butt for defendant's DNA to identify him in an ongoing criminal investigation, had merely obtained defendant's fingerprint from the cigarette butt to identify him. Would defendant be able to assert, under the Fourth Amendment, a reasonable expectation of privacy in the testing of the cigarette butt for fingerprint identification purposes? No, he would not. (See *Cupp v. Murphy* (1973) 412 U.S. 291, 294–295 [36 L.Ed.2d 900, 904–906, 93 S.Ct. 2000]; *Davis v. Mississippi* (1969) 394 U.S. 721, 727 [22 L.Ed.2d 676, 681, 89 S.Ct. 1394]; *People v. Ayala* (2000) 24 Cal.4th 243, 278–279 [99 Cal.Rptr.2d 532, 6 P.3d 193].) We see no distinction, for Fourth Amendment purposes, between these two situations.

### II.–V.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 388.

## DISPOSITION

The judgment is modified so that (1) the $10,000 parole revocation fine is stricken, and (2) defendant is awarded 506 days of presentence local conduct credits. As so modified, the judgment is affirmed. The trial court is directed to amend the abstract of judgment to reflect these two modifications, and to send a certified copy of the abstract to the Department of Corrections and Rehabilitation.

Raye, Acting P. J., and Robie, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 16, 2011, S189452.