Filed 5/3/13  P. v. Gonzalez CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>HUMBERTO ARREOLA GONZALEZ,<br><br>    Defendant and Appellant. | G045469<br><br>(Super. Ct. No. 10NF0819)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, James P. Marion, Judge.  Affirmed.

Christine Vento, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Susan Miller, Deputy Attorneys General, for Plaintiff and Respondent.

Humberto Arreola Gonzalez appeals from a judgment after a jury convicted him of two counts of forcible rape. Gonzalez raises numerous Fourth Amendment claims. None of his contentions have merit, and we affirm the judgment.

FACTS

*K.H.-Count 1*[1]

During the summer of 2006, K.H. reported to the Anaheim Police Department that she had been raped. About three hours later, K.H. agreed to have a medical examination, and an officer took her to a hospital. A genital examination did not show the presence of injuries but that did not conclusively establish the sexual intercourse was consensual. Vaginal swabs showed the presence of semen, which came from one male donor. It was determined the DNA from the sperm matched the DNA from Gonzalez's oral buccal swab. The parties stipulated K.H. was unavailable to testify, she had suffered a prior conviction for loitering to commit prostitution, and she had sexual intercourse with more than one man on the day of the alleged forcible rape.

*Keisha N.-Count 2*

In August 2007, Keisha N. was working as a prostitute. As she walked down Harbor Boulevard, Gonzalez stopped his truck next to her. Gonzalez answered in the affirmative when Keisha asked if he wanted her to get in the truck. Keisha got in the truck, and Gonzalez agreed to pay Keisha in exchange for her having sexual intercourse with him. After Gonzalez drove to a nearby business center parking lot, Keisha responded $100 when Gonzalez asked her the cost, and she got into the backseat.

Gonzalez said his wallet was under the seat, and he got out of the truck and reached under the seat. Gonzalez quickly moved into the backseat with what appeared to

---

[1] As we explain anon, the trial court granted Gonzalez's new trial motion as to count 1 on the grounds there was insufficient evidence of corpus delicti, and the prosecutor decided not to proceed further on that charge. However, we provide the facts underlying count 1 because the trial court instructed the jury it could consider that evidence as other crimes evidence pursuant to Evidence Code section 1108.

be an ice pick. When he put the ice pick to her neck, Keisha said, "'Please don't kill me. Please don't kill me. I have a daughter.'" Keisha tried to grab the ice pick and cut her finger. She eventually agreed to do whatever Gonzalez wanted her to do. When Gonzalez demanded money, Keisha said, "'I don't have no money. That's why I'm doing this.'" Gonzalez demanded she have sexual intercourse with him. Keisha agreed, but she asked him to wear a condom, which he refused to do. They had sexual intercourse and Gonzalez ejaculated inside of Keisha.

Keisha put her clothes on, returned to her room, and took a shower. Later, she went to the hospital to get tested for sexually transmitted diseases and obtain the "morning after" pill. Keisha gave hospital staff and a police officer her cousin's name, Cassandra K., because she was scared and on probation. The following day, Keisha had a sexual assault examination. The results of the examination were consistent with Keisha's account of what had happened but it could not be determined whether the sexual intercourse was consensual. It was determined the DNA from the sperm matched the DNA from Gonzalez's oral buccal swab.

*Unrelated Incident*

On August 30, 2008, officers discovered Gonzalez lying in a parking lot next to a vehicle. The semi-conscious Gonzalez had been stabbed multiple times and was covered in blood. Gonzalez stated four Hispanic men with knives had robbed him. Gonzalez was transported to a trauma center, and officers recovered his blood-soaked shirt and pants and personal items. The vehicle's doors were open, and officers observed the two front seats were reclined and there was lip gloss, a hairbrush, and perfume on or near the front passenger seat. Lying on the ground just outside the front passenger door was a used condom. Officers also seized these items.

Over four months later, Detective German Alvarez learned forensic testing revealed Gonzalez's DNA matched the DNA taken from K.H.'s and Keisha's vaginal swabs. Alvarez arranged with the detective who was the lead investigator on the stabbing

3

case to arrange a meeting with Gonzalez under the pretense they were working to solve his case and they needed Gonzalez's DNA. Gonzalez verbally agreed and signed a written consent form. Alvarez obtained a buccal swab from Gonzalez and later booked it into evidence. Alvarez arrested Gonzalez.

*Interviews*

Alvarez interviewed Gonzalez later that day.[2] Alvarez advised Gonzalez of his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), and told him he was under arrest for sexual assault. Gonzalez claimed someone stole his truck. Gonzalez denied he picked up prostitutes because he did not have a car but admitted he knew they worked near where he used to work. When Alvarez asked Gonzalez what his response would be if Alvarez told him the evidence was pointing to him, Gonzalez responded, "That I have to pay." Gonzalez eventually admitted he paid prostitutes to have sexual intercourse with him but he denied using a weapon or raping them. The two prostitutes Gonzalez claimed he was with did not match the ethnicity of the victims. He later denied paying prostitutes for sexual intercourse and claimed they were friends. When Alvarez left Gonzalez alone in the interview room, Gonzalez mused, "Oh, son of a fucking bitch." Alvarez then obtained a DNA sample from Gonzalez.

After Alvarez informed Detective Julissa Trapp that Gonzalez had waived his *Miranda* rights, Trapp interviewed Gonzalez.[3] After repeatedly denying he solicited prostitutes, Gonzalez eventually admitted he did on two occasions. After being presented with photographs of K.H. and Keisha, Gonzalez eventually admitted he threatened them with what he described as a "stick shift" and he forced them to have sexual intercourse with him.

---

[2] The interview was videotaped, and it was played for the jury.

[3] The interview was also videotaped, and it was played for the jury.

4

An information charged Gonzalez with two counts of forcible rape (Pen. Code, § 261, subd. (a)(2) (count 1-K.H. & count 2-Cassandra K.), and alleged he personally used a dangerous and deadly weapon and committed the offenses against more than one victim (Pen. Code, § 667.61, subds. (a), (b), & (e)(4)(5)).

Before trial, Gonzalez filed a motion to suppress evidence pursuant to section 1538.5. Because law enforcement officers searched and seized evidence without first obtaining a warrant, Gonzalez demanded the prosecutor justify the lawfulness of the officer's conduct pursuant to *People v. Williams* (1999) 20 Cal.4th 119, 130. Gonzalez sought to exclude all evidence obtained from the incident on August 30, 2008, including his blood-soaked shirt and pants, the used condom, the buccal swab containing his DNA, all subsequent forensic tests and analysis of the evidence, and his statements to law enforcement officers.

The prosecutor filed written opposition. The prosecutor explained that in case No. 09NF0188, a case alleging the same offenses, a different trial judge conducted a hearing and denied Gonzalez's motion to suppress, but the prosecutor dismissed the case. The prosecutor attached the transcript of the October 2010 hearing. The prosecutor alleged Gonzalez sought to litigate the same issues after the prosecutor refiled the case. The prosecutor asserted the trial court should decide the motion based on the written briefs and counsels' oral argument, and without an evidentiary hearing. The prosecutor argued the officers had a lawful right to be where they were, they were investigating felonious conduct, and the evidence was in plain view. The prosecutor also argued the search of the vehicle was lawful under the "'automobile exception.'" The prosecutor added that Gonzalez had no reasonable expectation of privacy in the clothes and condom lying on the ground or in the vehicle that was not registered in his name. Finally, the prosecutor contended Gonzalez consented to giving his DNA.

Gonzalez replied, and he also included as an exhibit a transcript of the October 2010 hearing. Gonzalez argued he was entitled to relitigate the suppression

5

motion because it was a new proceeding and he was entitled to an evidentiary hearing because there were disputed issues of fact. He did not object to the prosecutor submitting their case on the prior suppression motion transcript with the exception of one piece of testimony not relevant here. Gonzalez argued the plain view doctrine did not apply because the evidence must initially be incriminating as to him. He also contended the automobile exception did not apply because the clothes and the condom were not recovered from inside the vehicle. Gonzalez added he had a reasonable expectation of privacy in the condom because there was no evidence he discarded it before he was attacked. Finally, he contended the officers' ruse rendered the seizure illegal.

At the February 2011 hearing on Gonzalez's motion to suppress, after the trial court indicated it had read and considered the moving papers, the parties stipulated the trial court could consider the transcript from the October 2010 hearing in determining whether the prosecutor had satisfied its burden. Defense counsel indicated he planned to offer Gonzalez's testimony to refute some of the officers' statements. The parties also stipulated law enforcement officers did not have a search warrant or arrest warrant. The court and counsel clarified the subject of the motion was the clothes, the condom, the buccal swab and forensic testing, and Gonzalez's statements. The court took a short recess to read the October 2010 transcript.

The following factual statement is taken from the October 2010 hearing where Officer Wendy Beatley and Alvarez testified.

Beatley responded to a parking lot in an area known for prostitution and found a semi-conscious, wounded, and bloodied Gonzalez lying on the ground next to a vehicle with its driver side door open. The paramedics arrived and removed Gonzalez's shirt and pants to treat him. Beatley walked around the vehicle and found a used condom lying on the ground next to the front passenger door. The front seats were reclined all the way down and there was lip gloss, perfume, and a hair brush on the front passenger seat. Paramedics transported Gonzalez to the hospital; his pants and shirt remained at the

6

scene. Crime scene investigators arrived and seized the pants, shirt, and condom as evidence of a crime.

Almost five months later, Alvarez and officers from the Santa Ana Police Department who were investigating the stabbing of Gonzalez, went to Gonzalez's house for a prearranged meeting. Alvarez had information that linked Gonzalez to the rape of K.H. and Keisha, and the purpose of the visit was to obtain Gonzalez's DNA to determine whether he was involved in those crimes and arrest him. When the officers arrived, Gonzalez came out of his house, and Officer Frank Fajardo spoke with him while Alvarez remained about 10 feet away; Alvarez could not hear their conversation. Fajardo soon indicated to Alvarez, who was dressed in plain clothes but was wearing a badge and his gun belt, could join them. Officers did not place Gonzalez in handcuffs or restrain him in any manner. They stood about 15 feet away with their weapons in their holsters.

Alvarez introduced himself as a detective from the Anaheim Police Department.[4] Alvarez told Gonzalez he "was investigating similar cases to the one in which [Gonzalez] was a victim." He did not tell Gonzalez he was trying to connect him with the unsolved rapes. Alvarez asked Gonzalez if he would consent to a buccal swab for DNA testing and explained it involved the brushing of a Q-tip against the inside of the mouth. He read a consent to search form to him. Alvarez asked Gonzalez if he understood the consent to search form. Gonzalez indicated he did and he signed the form. Alvarez obtained the buccal swab from Gonzalez, who was calm and cooperative.

At the February 2011 suppression hearing, the trial court opined Gonzalez had preliminarily demonstrated a reasonable expectation of privacy in the pants and shirt he was wearing when officers arrived at the scene. The court added he had not made a preliminary showing of a reasonable expectation of privacy in the condom.

---

[4]         Their conversation was in Spanish. Alvarez's primary language was Spanish.

Gonzalez testified at the hearing. Gonzalez stated he had been stabbed and the investigating officer was Fajardo. Fajardo called and told him that he could get Gonzalez some money from the county because he had been out of work. The next day, Fajardo called Gonzalez and said he was on the way to his house. Gonzalez went outside because he thought Fajardo was going to give him a check. Fajardo told Gonzalez that Alvarez was going to assist him because Alvarez "specialized in [his] case." Alvarez told Gonzalez he needed to get his DNA to help him with his case. Gonzalez consented based on his relationship with Fajardo. Gonzalez would not have signed the form and consented to the buccal swab if he had known it could be used against him in other cases.

After hearing counsels' argument, the trial court characterized the case as possibly one of first impression. The court explained the officers acted reasonably. The court reasoned that when paramedics arrived they could not detect a lower extremity pulse and had paramedics not removed Gonzalez's clothes to treat him, Gonzalez might have died. The court opined "the police were not on a fishing expedition" but instead were there to help him. The court stated the items were in plain view. The court also ruled Gonzalez consented to the buccal swab and Alvarez was in fact "investigating similar cases." The court added: "The fact that a police officer privately suspected [Gonzalez] of rape in an unrelated case goes to the police officer's state of mind which the court finds in this particular incident is not relevant. [¶] The court finds that based on the surrounding circumstances, [Gonzalez] freely consented to the swab. The court finds no submission to authority or other coercion to vitiate the consent." The trial court denied Gonzalez's motion to suppress.

At trial, Keisha testified concerning the facts detailed above. She testified pursuant to a grant of use immunity. The parties stipulated that in May 2007, Keisha pled guilty to loitering to commit prostitution and the court placed her on three years of informal probation. The terms of her probation prohibited her from violating any law and required her to use her true name and birth date at all times.

A jury convicted Gonzalez of both counts and found true the enhancement allegations. After the trial court granted Gonzalez's new trial motion as to count 1 and the prosecutor decided not to proceed further on that count, the trial court sentenced Gonzalez to prison for 15 years to life on count 2.

## DISCUSSION

"'""An appellate court's review of a trial court's ruling on a motion to suppress is governed by well-settled principles. [Citations.] [¶] In ruling on such a motion, the trial court (1) finds the historical facts, (2) selects the applicable rule of law, and (3) applies the latter to the former to determine whether the rule of law as applied to the established facts is or is not violated. [Citations.] 'The [trial] court's resolution of each of these inquiries is, of course, subject to appellate review.' [Citations.] [¶] The court's resolution of the first inquiry, which involves questions of fact, is reviewed under the deferential substantial-evidence standard. [Citations.] Its decision on the second, which is a pure question of law, is scrutinized under the standard of independent review. [Citations.] Finally, its ruling on the third, which is a mixed fact-law question that is however predominantly one of law, . . . is also subject to independent review."'" [Citation.]" (*People v. Ayala* (2000) 24 Cal.4th 243, 279 (*Ayala*).) We apply federal standards on appeal from a trial court's denial of a motion to suppress. (*People v. Camacho* (2000) 23 Cal.4th 824, 830 (*Camacho*).)

*I. Warrantless Seizure-Condom and Clothes*

*A. Reasonable Expectation of Privacy*

The Fourth Amendment protects a person's reasonable expectation of privacy against unreasonable searches and seizures. (*Katz v. United States* (1967) 389 U.S. 347, 350-351 (*Katz*).) A warrant is required unless certain exceptions apply, including the exception law enforcement officers "may seize any evidence that is in plain view during the course of their legitimate emergency activities." (*Mincey v. Arizona* (1978) 437 U.S. 385, 392-393.)

9

"The 'ultimate standard set forth in the Fourth Amendment is reasonableness' [citation], and, after *Katz*[, *supra,*] 389 U.S. 347 . . ., we ask two threshold questions.  First, did the defendant exhibit a subjective expectation of privacy? Second, is such an expectation objectively reasonable, that is, is the expectation that one society is willing to recognize as reasonable?  [Citations.]" (*Camacho, supra,* 23 Cal.4th at pp. 830-831.)  "There is no set formula for determining whether a person has a reasonable expectation of privacy in the place searched, but the totality of the circumstances are considered.  [Citation.]  Among the factors sometimes considered in making the determination are whether the defendant has a possessory interest in the thing seized or place searched [citation], 'whether he has the right to exclude others from that place; whether he has exhibited a subjective expectation that it would remain free from governmental invasion; whether he took normal precautions to maintain his privacy and whether he was legitimately on the premises.' [Citation.]" (*In re Rudy F.* (2004) 117 Cal.App.4th 1124, 1132.)

"A defendant has the burden at trial of establishing a legitimate expectation of privacy in the place searched or the thing seized.  [Citations.]  The prosecution has the burden of establishing the reasonableness of a warrantless search.  [Citations.]" (*People v. Jenkins* (2000) 22 Cal.4th 900, 972.)

*1.  Condom*

Gonzalez asserts he had a reasonable expectation of privacy in the used condom lying on the ground near the passenger side door of the vehicle because there was no evidence he knowingly relinquished control of the item.  Not so.

In *People v. Gallego* (2010) 190 Cal.App.4th 388, 393 (*Gallego*), police officers collected a cigarette butt defendant tossed onto a sidewalk and tested it for DNA. The court concluded the test did not constitute a search because defendant could claim no privacy interest in the cigarette butt he had voluntarily and consciously abandoned in a public place.  (*Id.* at p. 395.)  The court relied on *California v. Greenwood* (1988)

486 U.S. 35, 40-41 (*Greenwood*), where the United States Supreme Court found no reasonable expectation of privacy in garbage bags containing evidence of drug trafficking because the bags had been left at the curb for garbage collection. (*Gallego, supra,* 190 Cal.App.4th at pp. 395-396.) The *Gallego* court analogized the DNA testing of the discarded cigarette butt to the lifting of fingerprints from discarded juice containers in *Ayala, supra,* 24 Cal.4th at pages 278 to 279. (*Gallego, supra,* 190 Cal.App.4th at p. 398.)

Here, the used condom was lying on the ground next to the passenger side of the vehicle. Gonzalez was lying on the ground on the driver side of the car. Additionally, Gonzalez was fully clothed when Beatley discovered him. As Gonzalez was fully clothed when Beatley found him, it is certainly reasonable to conclude Gonzalez and his companion had concluded their sexual activities and either Gonzalez or his companion removed the condom and voluntarily and consciously discarded it in the parking lot. Thus, similar to the discarded cigarette butt in *Gallego*, Gonzalez had no reasonable expectation of privacy in a used condom that was discarded in a public place. Gonzalez's suggestion he would keep the used condom as a sort of trophy of his escapades is ludicrous.

*2. Clothes*

Gonzalez contends he had a reasonable expectation of privacy in the clothes he was wearing when Beatley and the paramedics arrived. The Attorney General does not dispute Gonzalez had a reasonable expectation of privacy in his ensemble. We agree.

A person certainly has a reasonable expectation of privacy in the clothes he wears and that expectation is undoubtedly one society is willing to recognize as reasonable. No sensible person would conclude an officer may approach you and lawfully seize your clothing without a warrant or some legal justification. Gonzalez had a possessory interest in the clothes he wore and he had a right to exclude others from seizing his shirt and pants. Therefore, Gonzalez had a reasonable expectation of privacy

11

in the clothes he wore. We must now determine whether officers lawfully seized those items that were in plain view.

B. *Plain View*

Gonzalez argues the plain view exception was inapplicable because the incriminating nature of the items was not reasonably apparent. Nonsense.

The plain view doctrine is an exception to the general rule warrantless searches are presumptively unreasonable. (*Horton v. California* (1990) 496 U.S. 128, 133 (*Horton*).) "'It is well established that under certain circumstances the police may seize evidence in plain view without a warrant. . . . [¶] '[T]he "plain view" doctrine has been applied where a police officer is not searching for evidence against the accused, but nonetheless inadvertently comes across an incriminating object. [Citations.]'" (*Id.* at pp. 134-135.) However, there are limitations on the plain view doctrine. "It is, of course, an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed. There are, moreover, two additional conditions that must be satisfied to justify the warrantless seizure. First, not only must the item be in plain view; its incriminating character must also be 'immediately apparent.' [Citations.] . . . Second, not only must the officer be lawfully located in a place from which the object can be plainly seen, but he or she must also have a lawful right of access to the object itself." (*Horton, supra,* 496 U.S. at pp. 136-137, fn. omitted.)

As to whether an object's incriminating character is immediately apparent, the police must have probable cause to believe the object in plain view is contraband without conducting a search of the object. (*People v. Stokes* (1990) 224 Cal.App.3d 715, 719.) "In the context of the plain view doctrine, probable cause is a flexible, commonsense standard, which requires only that the facts available to the officer would warrant a person of reasonable caution in believing that the item may be contraband or stolen property or evidence of a crime. No showing is required that such a belief is

correct or more likely true than false. 'A "practical, nontechnical" probability that incriminating evidence is involved is all that is required. [Citation.]' [Citations.] The determination whether there is probable cause to believe property in plain view has been stolen depends on the totality of the circumstances known to the officer which reasonably bear on the question; the officer's determination is not limited to an examination of the property itself. [Citations.]" (*Id*. at pp. 719-720.)

Here, law enforcement officers were lawfully in a place where they had a right to be, and they had probable cause to believe the clothes and the condom were contraband without conducting a search of those items. Officers discovered a semi-unconscious, fully clothed Gonzalez lying on the ground covered in blood next to the driver's side of the vehicle. On the passenger's side of the vehicle, officers found a used condom, in an area known for prostitution. Officers were investigating a crime and were not limited by Gonzalez's explanation of what transpired. Gonzalez could have been attacked not by four knife-wielding men but instead by a knife-wielding prostitute whose DNA was on the condom. Needless to say, if the officers' investigation was limited to what the victim told them, a great many crimes would go unsolved.

As to Gonzalez's clothes, after paramedics removed Gonzalez's clothes to treat his injuries, the clothes lay on the ground when paramedics transported him to the hospital. Gonzalez does not dispute paramedics acted properly in removing his clothes. Thus, the paramedics' conduct was reasonable in removing Gonzalez's clothes to treat his life-threatening injuries. As to their incriminating nature, officers observed Gonzalez had been stabbed numerous times. His clothes were covered in blood. It was certainly reasonable for officers to conclude that the shirt and pants would assist them in solving the crime. It was possible the attacker's blood, and DNA, could be recovered from the clothes. It was also possible the clothes could assist officers in determining the type of weapon used. Thus, officers were lawfully in a place where they had a right to be and properly confiscated the clothes and condom because officers had probable cause to

13

believe a crime had been committed.  (*People v. Kraft* (2000) 23 Cal.4th 978, 1043 ["[I]t is sufficient that the investigators have probable cause to believe the item is evidence of *some* crime"].)

II.  *Consent*

Gonzalez contends his consent was not voluntary because it was obtained through trickery and deception.  We disagree.

"[T]he compulsory, nonconsensual extraction of DNA samples constitutes a search and seizure under the Fourth Amendment.  [Citations.]" (*People v. Travis* (2006) 139 Cal.App.4th 1271, 1281.)  "A search conducted pursuant to consent 'is a constitutionally permissible and wholly legitimate aspect of effective police activity.' [Citation.]  'In situations . . . where the police have some evidence of illicit activity, but lack probable cause to arrest or search, a search authorized by a valid consent may be the only means of obtaining important and reliable evidence.' [Citation.] [¶]  Of course, the consent must be freely and voluntarily rendered and not be the product of police coercion.  [Citation.]  Whether a particular consent is voluntary depends on the totality of the circumstances; no single factor is dispositive of this factually intensive inquiry. [Citation.]  Thus, while police deception as to the purpose of the search is relevant in assessing a suspect's consent, it cannot be analyzed in a vacuum without reference to the surrounding circumstances.  [Citations.]" (*People v. Avalos* (1996) 47 Cal.App.4th 1569, 1577-1578 (*Avalos*).)

*Avalos, supra,* 47 Cal.App.4th 1569, although not identical, is instructive. In that case, officers obtained information from a confidential informant and followed defendant to a commercial storage unit.  (*Id.* at pp. 1574-1575.)  Defendant emerged carrying a box smaller than the one he brought into the facility.  (*Ibid.*)  Officers stopped defendant's truck and requested permission to search the vehicle for property stolen in a recent burglary "'in addition to some other contraband.'" (*Id.* at p. 1575.)  Defendant signed a consent-to-search form, and officers found five pounds of methamphetamine in

14

a box inside the truck.  (*Ibid.*)  Defendant filed a motion to suppress, arguing the police ruse negated his consent to the search.  (*Id.* at pp. 1575, 1577.)  A majority of this court disagreed.  The majority explained the officers clearly identified themselves and "merely made a partial misrepresentation concerning the object of the search."  (*Id.* at p. 1579.)  The majority added the officers ensured defendant's consent was voluntary.  The majority concluded defendant was not materially misled "as to the privacy rights he was surrendering."  (*Ibid.*)

Here, Alvarez told Gonzalez he was a detective, told him he "was investigating similar cases to the one in which he was a victim[,]" and asked him if he could obtain a buccal swab.  Although Gonzalez claimed both Fajardo and Alvarez told him Alvarez was going to assist with the case, Alvarez never told Gonzalez he was trying to find the persons, or person, who stabbed him.  Thus, Alvarez did not disguise his identity, conceal the fact he wanted to obtain Gonzalez's DNA, or materially mislead Gonzalez as to the privacy rights he was surrendering.

Moreover, like *Avalos*, Alvarez also ensured Gonzalez's consent was voluntary.  Alvarez explained to Gonzalez the purpose of the buccal swab and how he would obtain it.  Alvarez read the consent-to-search form to Gonzalez and asked him of he understood the form.  Gonzalez indicated he did understand the form and he signed the form.  Finally, Gonzalez was not under arrest, physically restrained, or threatened in any manner.

Gonzalez reliance on *People v. Reyes* (2000) 83 Cal.App.4th 7 (*Reyes*), and *Graves v. Beto* (5th Cir. 1970) 424 F.2d 524 (*Graves*), is misplaced.  *Reyes, supra,* 83 Cal.App.4th 7, is another case from this court.  In that case, the police went to a parolee's apartment to conduct a narcotics investigation.  They planned to search anyone whom they could lure outside.  An undercover officer dressed in jeans and a T-shirt peered through the front screen door and said he hit defendant's truck in the alley.  When defendant walked outside to check for auto damage, a team of narcotics officers in raid

15

gear accosted defendant and found methamphetamine in his shirt pocket. (*Id.* at pp. 8-9.) The court opined defendant was unlawfully detained and held "[a] deception used to gain entry into a home and a ruse that lures a suspect out of a residence is a distinction without much difference. . . . [I]n those instances where the identity of the officers is not known to the responding party, we think the dispositive issue ought to be the nature of the ruse employed." (*Id.* at pp. 12-13.) As we explain above, it was clear Alvarez was a police officer and Alvarez did not lie about his purpose in contacting Gonzalez or his reason for obtaining the buccal swab.

Graves, supra, 424 F.2d 524, is also inapposite. In that case, defendant initially refused to give a blood sample but later consented when he was told it would be used only to determine alcohol content. (*Id.* at p. 525.) The court refused to allow the blood sample to be used later to establish identity. (*Ibid.*) Here, there is no evidence indicating Gonzalez was assured his DNA would only be used to investigate the case in which he was the victim.

Finally, we are not bound by federal circuit court opinions even on questions of federal law. (*Camacho, supra,* 23 Cal.4th at p. 830, fn. 1.) Thus, based on a totality of the circumstances we cannot conclude officers materially misled Gonzalez about the privacy rights he was surrendering and his consent was voluntary.

III. *DNA Testing*

Gonzalez claims the DNA testing of the blood on his clothes and the semen in the condom constituted a separate search from their initial acquisition and required a separate justification under Fourth Amendment principles. Not so.

In *United States v. Edwards* (1974) 415 U.S. 800 (*Edwards*), the police had probable cause to believe the articles of clothing worn by defendant were "material evidence" of the crime for which he had been arrested. (*Id.* at p. 805.) The Supreme Court of the United States stated: "When it became apparent that the articles of clothing were evidence of the crime for which [defendant] was being held, the police were entitled

16

to take, examine, and preserve them for use as evidence, just as they are normally permitted to seize evidence of crime when it is lawfully encountered. [Citations.]" (*Id*. at p. 806.)

In *People v. Teale* (1969) 70 Cal.2d 497 (*Teale*), the California Supreme Court upheld the warrantless seizure of an automobile in which police believed the victim was shot. The officers seized the car incident to a lawful arrest and 10 days later a criminalist examined the car and found the victim's blood spattered on the interior. The court found no violation of the Fourth Amendment and, in fact, no search, since the automobile was itself evidence subject to seizure. (*Id.* at pp. 508-511.) The court reaffirmed its previous statement: "'[W]hen the police lawfully seize a car which is itself *evidence* of a crime rather than merely a container of incriminating articles, they may postpone searching it until arrival at a time and place in which the examination can be performed in accordance with sound scientific procedures.'" (*Id*. at p. 508.)

In *People v. Griffin* (1988) 46 Cal.3d 1011 (*Griffin*), the California Supreme Court upheld the taking of blood samples from defendant's lawfully impounded truck. The court explained that "the truck in this case was itself evidence. The bloodstains that had soaked into the floorboard of the truck were clearly an appropriate subject of scientific examination and within the limits of the instrumentality exception." (*Id.* at p. 1025.) The court observed, "The propriety of a warrantless seizure and search where the vehicle is itself evidence or the instrumentality of a crime is implicit in a number of United States Supreme Court decisions as well. [Citations.]" (*Id.* at p. 1025.)

Here, as we explain above, Gonzalez had no reasonable expectation of privacy in the discarded used condom. (See *Gallego, supra,* 190 Cal.App.4th at pp. 396-397 [DNA testing of a cigarette butt defendant tossed onto a public sidewalk to identify him in ongoing criminal investigation did not constitute search under the Fourth Amendment].) And although he had a reasonable expectation of privacy in his clothes when he was wearing them, paramedics acted reasonably in removing Gonzalez's

17

clothes to treat his life-threatening injuries.  Officers who were lawfully in a place they had a right to be were justified in seizing his clothes and the condom that were in plain view and were material evidence in a criminal investigation.

Based on *Edwards*, *Teale*, and *Griffin*, we conclude law enforcement officers were not required to obtain a search warrant to perform scientific examination of Gonzalez's clothes and the used condom.  Officers properly seized that evidence pursuant to an exception to the warrant requirement, and the clothes and the condom were material evidence in a criminal investigation.  Law enforcement officers were justified in submitting that evidence for scientific examination.

Gonzalez argues *Edwards*, and the other cases the Attorney General relies on, all involve individuals with a diminished expectation of privacy.  Again, Gonzalez had no reasonable expectation of privacy in the condom.  With respect to Gonzalez's clothes, the bloodstains that had soaked into his shirt and pants were clearly an appropriate subject of scientific examination and within the limits of the plain view exception where the clothes were lawfully seized as part of a criminal investigation.

Finally, Gonzalez relies on *Arizona v. Hicks* (1987) 480 U.S. 321, and *Skinner v. Railway Labor Executives' Ass'n.* (1989) 489 U.S. 602, to argue the forensic testing was an additional intrusion and thus was an independent search requiring a warrant or separate justification.  *Gallego, supra,* 190 Cal.App.4th at page 388, persuasively dispensed with the same argument.  The forensic testing here, like the forensic testing in *Gallego*, "was not done to 'obtain physiological data,' but only to identify a particular person in an ongoing criminal investigation."  (*Id.* at p. 398.)

IV.  *Fruit of the Poisonous Tree Doctrine*

Gonzalez claims all inculpatory evidence from his clothes and the used condom should be excluded pursuant to the fruit of the poisonous tree doctrine.  Not so.

Under the "'fruit of the poisonous tree'" doctrine, both direct and indirect products of an unreasonable search are subject to exclusion.  (*Wong Sun v. United States*

18

(1963) 371 U.S. 471, 488.)  As we explain above, law enforcement officers acted reasonably in removing Gonzalez's clothes and seizing the clothes and condom pursuant to the plain view exception to the warrant requirement.  Thus, there was no unreasonable search, officers did not violate Gonzalez's Fourth Amendment rights, and the fruit of the poisonous tree doctrine has no application to the facts of this case.

DISPOSITION

The judgment is affirmed.

O'LEARY, P. J.

WE CONCUR:

MOORE, J.

ARONSON, J.