Filed 12/3/20  P. v. Young CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>DEJUAN OMAR YOUNG,<br><br>　　　Defendant and Appellant. | A156553<br><br>(Solano County<br>Super. Ct. No. FCR330156) |

Defendant Dejuan Young was tried on multiple drug and weapon charges after the trial court denied his motion to suppress the narcotics, handgun, and ammunition that underpinned the charges.  He was found guilty as charged and sentenced to nine years four months in prison.  He appeals, contending his suppression motion was wrongly denied.  We conclude otherwise and affirm.

## FACTUAL BACKGROUND

Defendant was arrested in May 2017 after two Fairfield police detectives saw him engaging in behavior consistent with drug dealing and carrying a box that was subsequently found to contain methamphetamine, a firearm, and ammunition.  Defendant moved to suppress the evidence, and his motion was considered concurrently with the preliminary hearing, at which the following testimony was given:

1

On the afternoon of May 9, 2017, Fairfield Police Detectives Keith Pulsipher and Amanda Graham were on patrol conducting "proactive enforcement" in the area of 101 Tabor Avenue in response to numerous complaints regarding drug dealing in the area. Pulsipher was aware of three such complaints, and Graham had personally received at least two complaints regarding that particular location. They were both wearing their "raid uniform" which consisted of a t-shirt emblazoned with the word "Police" on the front and both sleeves and a vest with a badge bearing the word "Police" and the detective's name. They were driving a black patrol car that lacked external markings but had a light bar inside the passenger compartment in the front windshield.

Pulsipher and Graham were well trained in identifying individuals dealing narcotics, having both completed an 80-hour narcotics investigators program offered by the California Commission on Peace Officer Standards and Training. Pulsipher was a member of the California Narcotics Officers Association and had attended its 24-hour annual training program the previous three years. He had also attended three or four different trainings specifically on methamphetamine and the sale of it, and had investigated an estimated 30 cases involving the sale of narcotics. Graham had attended three different California Narcotics Officers Association conferences, had made over 50 arrests for possession of methamphetamine for sale, and had testified more than 10 times as an expert on possession of methamphetamine for sale.

As Pulsipher and Graham were patrolling on May 9, 2017, they drove past an apartment complex located at 101 Tabor Avenue. In front of the complex, they saw two individuals who were later identified as defendant and Lionel Gillespie. Gillespie was on the sidewalk and defendant was in a

parking lot close to the sidewalk. Gillespie appeared to be acting as a lookout, "kind of looking up and down the street monitoring traffic and kind of inspecting vehicles as they dr[o]ve by to see what nature of people were driving by the area," while defendant was "kind of standing back a little bit more" until a vehicle approached, when he would walk up to the driver's side. This behavior caught Pulsipher's attention because often when selling narcotics as a group, "one person will act as a look-out, while the other person holds whatever substance is being sold, whatever type of narcotics is being sold, and when it's clear, that person will approach to complete the transaction, whereas he'll hand the narcotics, be it methamphetamine, be it marijuana, cocaine, what have you, to the purchaser, who will then hand them money . . . ."

When Pulsipher and Graham drove by the 101 Tabor Avenue apartment complex a second time, an SUV had partially pulled into the parking lot in front. Gillespie was standing at the window of the vehicle and defendant was casually walking towards them carrying a black box, a pattern that in the detectives' experience was consistent with drug sales. When defendant spotted the police car, he made eye contact with Graham and immediately put his hand in his front pants pocket and began walking towards a waist-high fence, "taking items out of his pocket and discarding them . . . ." Defendant then attempted to discard the black box by placing it behind the fence. As Graham described it, "[H]e's crouching down towards this fence as he['s] going towards it as if he was either going to put the box down or hide behind the fence." After the detectives had driven about 20 yards past the apartment complex, defendant stood up with the box in his hands and began walking away from the direction the detectives were traveling.

3

Pulsipher turned the car around and parked in front of the apartment complex. He got out, started walking towards defendant, and shouted, "Get over here." Defendant did not comply, instead walking towards the apartment complex. Pulsipher found this suspicious because defendant had attempted to discard the box and was ignoring the instructions of a uniformed police officer.

Pulsipher continued to walk towards defendant and again instructed him to "Get over here." Defendant still did not comply, and continued to move away from Pulsipher, who in turn picked up his speed and began jogging towards defendant, again commanding defendant to come towards him. As defendant approached a six-foot fence adjacent to the nearest apartment, he raised the box as if he were going to throw it over the fence. Pulsipher lunged at defendant and grabbed him, propelling the two of them into the fence. As he grabbed defendant, "the box went over the fence." According to Pulsipher, "I couldn't tell if he threw the box over the fence or if my contact with him caused the box to fall over the fence." Defendant tried to pull away, so Pulsipher "took him to the ground" and eventually placed him in handcuffs despite defendant putting up a struggle. During the struggle, defendant said, "I live right here. I can show you my I.D." Defendant was immediately searched, and items on his person were placed on the ground. Pulsipher walked him to the patrol car, placed him in the back seat, and returned to the spot where he had subdued defendant.

While Pulsipher was escorting defendant to the patrol car, Graham went to the fence to retrieve the box. One of the boards in the fence had broken when Pulsipher and defendant collided with it, and she could see the box lying on the ground on the other side. She moved the board next to the broken board out of the way, entered the area behind the fence, retrieved the

4

box, came out, and placed the box with the items that had been removed from defendant.

A few minutes after retrieving the black box, Graham opened it and found a handgun with nine live rounds in the magazine and a black, zippered case. Inside the zippered case was a silver cardboard jewelry box that contained six baggies of methamphetamine. Defense counsel played a video recording from Graham's body camera, which indicated that approximately three minutes lapsed between when Pulsipher handcuffed defendant and when Graham opened the box.[1]

Another baggie of methamphetamine was recovered from the area where defendant was when he spotted the patrol car and appeared to be discarding something he had removed from his pocket.

Defendant testified that he lived in an apartment at 101 Tabor Avenue and that the area behind the fence was a yard exclusive to his apartment.

## PROCEDURAL BACKGROUND

Defendant was charged with multiple drug and weapon offenses following his May 9, 2017 arrest. On December 26, 2017, he filed a motion to suppress the evidence recovered during the incident. He asserted that the warrantless search of his yard and the black box were illegal because he had been unlawfully detained and had a reasonable expectation of privacy with respect to his yard where the box was recovered.

In written opposition, the prosecutor argued that the detention, which occurred when Pulsipher made contact with defendant, was supported by reasonable suspicion, and defendant lacked standing to seek suppression of the box's contents because he abandoned the box.

---

[1] The video recording is not part of the record on appeal.

Defendant's motion to suppress was considered concurrently with the preliminary hearing. After hearing the evidence and argument, the magistrate denied the motion. He first found there was reasonable suspicion to detain defendant because his and Gillespie's conduct was consistent with a "go-between" and a "look-out" during a street-level drug sale, he attempted to evade the police, and he appeared to discard something upon seeing them. The magistrate further concluded that after defendant was detained, exigent circumstances justified Graham's retrieval of the box from behind the fence because defendant "threw it over a fence" and "[h]e can't abandon it but claim ownership of it at the same time." According to the magistrate, "The defendant was trying to prevent the officers from accessing that, and under these circumstances, they had every right to go through the fence, to grab the box and open it." The magistrate considered it inconsequential that Graham did not open the box immediately after retrieving it.

On January 22, 2018, the Solano County District Attorney filed an information charging defendant with possession of methamphetamine with a firearm, possession of a firearm by a felon, unlawful possession of ammunition, and possession of methamphetamine for sale, the last count accompanied by a special allegation that defendant was personally armed with a firearm while possessing methamphetamine for sale.

On May 22, defendant filed a renewed motion to suppress pursuant to Penal Code sections 859c and 1538.5, subdivision (i). He argued that the magistrate misapplied the law when he found a lawful detention because neither officer observed any "hand-to-hand transactions," saw any objects or currency being exchanged, or conducted any follow up investigation of vehicles that were suspected to have been at the apartment building to purchase drugs. He also argued that the magistrate erred in finding that he

6

had abandoned the black box and that exigent circumstances justified the warrantless search of the black box.

On June 5, defendant's renewed suppression motion came on for hearing. Following argument, the court denied the motion. It ruled that defendant's detention, which occurred when Pulsipher physically restrained him, was based on a reasonable suspicion that he was selling narcotics, to wit: The detectives received several complaints of drug activity in the area; they saw defendant engage in conduct that, based on their experience and training, was consistent with drug dealing; he acted evasively upon spotting the detectives in their identifiable law enforcement vehicle and appeared to discard something; he ignored all commands to walk towards Pulsipher; and he raised the box up as if he were going to throw it over the fence when he was confronted. The court also made the following findings: defendant "voluntarily discarded the box in the face of police observation and imminent lawful detention or arrest in order to avoid incrimination. He just abandoned it"; the search of the box could be justified as a search incident to arrest as the officers had probable cause for an arrest and Graham retrieved the box "about 30 seconds" after Pulsipher took defendant down and then searched the box about three minutes after defendant was handcuffed; and seizure of the box was justified under the exigent circumstances doctrine because the detectives were aware of complaints about drug activity in the area, they observed defendant engaging in what appeared to be drug deals, and it was reasonable for the detectives to believe the box contained "contraband pertinent to drug sales" and to retrieve it before someone else did because "there was no evidence they knew whose fenced-in area the defendant was throwing the box into."

Defendant filed a petition for writ of mandate challenging denial of his suppression motion. We denied it on July 26, 2018. (No. A154624.)

A jury trial resulted in guilty verdicts on all counts and a true finding on the firearm enhancement. Defendant was sentenced to nine years four months in prison.

This timely appeal followed.

## DISCUSSION

### Standard of Review

In *People v. Hua* (2008) 158 Cal.App.4th 1027, 1033, the court summarized the standard of review applicable here: "Where, as here, a motion to suppress is submitted to the superior court on the preliminary hearing transcript, 'the appellate court disregards the findings of the superior court and reviews the determination of the magistrate who ruled on the motion to suppress, drawing all presumptions in favor of the factual determinations of the magistrate, upholding the magistrate's express or implied findings if they are supported by substantial evidence, and measuring the facts as found by the trier against the constitutional standard of reasonableness.' [Citation.] 'We exercise our independent judgment in determining whether, on the facts presented, the search or seizure was reasonable under the Fourth Amendment. [Citation.]' [Citation.] We affirm the trial court's ruling if correct under any legal theory."

### Defendant Was Legally Detained

Defendant first argues that Pulsipher lacked probable cause to detain him. This argument fails, one reason being that it invokes the wrong standard. It is well established that a detention must be supported by *reasonable suspicion* that defendant is engaging in criminal activity, not, as

8

defendant articulates, by probable cause. Our Division Four colleagues recently discussed the reasonable suspicion standard:

"A 'brief, investigatory stop' is justified where an officer has 'reasonable, articulable suspicion that criminal activity is afoot,' implicating the suspect. [Citations.] While the more demanding standard of probable cause requires a basis to suspect someone of having committed a particular crime, reasonable suspicion to detain only requires facts connecting the suspect to 'criminal activity' more generally. [Citation.] Like the probable cause determination, the applicable test courts use to assess reasonable suspicion is an objective one, specific to the detainee. [Citation.]

"Our Supreme Court recently explained that ' "[a] detention is reasonable under the Fourth Amendment when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." [Citation.] Such reasonable suspicion cannot be based solely on factors unrelated to the defendant, such as criminal activity in the area.' [Citation.] Reasonable suspicion must rest on objective particulars tying a particular person to criminal activity, rather than on a mere 'hunch' that something is odd or unusual about the person detained." (*Cornell v. City and County of San Francisco* (2017) 17 Cal.App.5th 766, 779–780; accord, *Navarette v. California* (2014) 572 U.S. 393, 396–397; *People v. Zaragoza* (2016) 1 Cal.5th 21, 56–57.) The record supports the conclusion that Pulsipher and Graham had a reasonable suspicion that defendant was selling narcotics.

A detention occurs " ' "when [a police] officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." ' [Citation.] An officer must either 'intentionally appl[y] hands-on, physical

9

restraint' or 'initiate a show of authority, to which the objectively reasonable innocent person would feel compelled to submit, and to which the suspect actually does submit for reasons solely attributable to the police show of authority.' " (*In re J.G.* (2014) 228 Cal.App.4th 402, 409.)  Given that a detention does not occur until "the person actually submits to the show of authority" (*People v. Brown* (2015) 61 Cal.4th 968, 974), defendant was not detained until Pulsipher physically contacted him in front of the six-foot fence.  At that point, the circumstances known to the detectives were these: They had received several complaints about drug dealing in the area, Pulsipher being aware of at least three such complaints, Graham having personally received two such complaints.  Driving past 101 Tabor Avenue, they observed defendant and Gillespie acting in a manner consistent with drug dealing—Gillespie acting as a lookout and defendant going in to complete the sales from the contents of a black box he was carrying.  When defendant spotted the patrol car driving by and made eye contact with Graham, he appeared to discard something from his pocket and walked to a waist-high fence behind which he appeared to place the box.  After the detectives drove past the complex, defendant began walking away from the direction they were traveling.  When the detectives parked in front of the 101 Tabor Avenue apartment complex, Pulsipher got out of the patrol car and directed defendant multiple times to "Get over here."  Defendant did not comply and instead walked away, approached the six-foot fence, and raised the box in an effort to toss it over the fence.  These circumstances raised a reasonable suspicion that defendant was engaged in drug dealing and justified his detention.

In arguing to the contrary, defendant primarily relies on three cases, none of which avails him.  He claims *People v. Casares* (2016) 62 Cal.4th 808

10

held that "the fact a person is in an area known for criminal activity does not create reasonable suspicion, because that geographical fact is utterly unrelated to the individual suspect." What *Casares* actually recognized is that "a subject's presence in an area of expected criminal activity does not *alone* support a reasonable suspicion he or she is committing a crime." (*Id.* at p. 838.) Defendant was not detained based merely on his presence in an area with prevalent drug dealing.

Defendant next cites *Cunha v. Superior Court* (1970) 2 Cal.3d 352, arguing that there "the High Court found no probable cause to arrest, even though there were stronger indications that the suspect was engaged in drug sales than there were in this case," and that the Court "had misgivings about whether [the officers'] observations would support even the 'reasonable suspicion' standard." In that case, the officers saw Cunha and a companion walking in an area where the officers had made numerous narcotics arrests. As the two were walking, they were looking around to see if anyone was watching. When they stopped, they both reached into their pants pockets, defendant removing what appeared to be money, his companion removing "an object," and then placed their hands together in an apparent exchange. The officers arrested them both and immediately recovered balloons containing heroin from Cunha's pocket. (*Id.* at pp. 354–355.)

Our Supreme Court held that the search was not a lawful search incident to arrest because there was no probable cause for an arrest: "The instant arrest was predicated solely upon the officers' observations that petitioner and his companion looked around as they walked on a public sidewalk in broad daylight, and apparently engaged in some sort of transaction in an area known for frequent narcotics traffic. Neither petitioner's activities nor the location of his arrest provided probable cause

11

for arrest." (*People v. Cunha, supra*, 2 Cal.3d at p. 357.) In dictum, the Court also observed that it had "some doubts" as to whether Cunha's "activities were sufficient to justify a detention . . . ." (*Id.* at p. 356.) This case is inapposite as it involved probable cause for an arrest, which is not the issue here. And the dictum regarding "some doubts" as to the sufficiency of the circumstances to support a detention is neither binding nor persuasive, as the factors suggesting defendant was engaged in criminal activity here were more compelling than those in *Cunha*.

The third case defendant cites—*People v. Stanfill* (1985) 170 Cal.App.3d 420—also involved probable cause for an arrest and has no significance for that reason alone.

### Exigent Circumstances Justified Detective Graham's Warrantless Entry into the Fenced-In Area and Seizure of the Black Box

Defendant next argues that the trial court erred in finding that exigent circumstances justified Graham's entry into his yard and her retrieval of the black box. We reject this claim.

A warrantless entry into a private residence, including its curtilage, is presumptively unreasonable. (*United States v. Dunn* (1987) 480 U.S. 294, 301 [curtilage is the area "intimately tied to the home" such as a detached garage or a fenced area immediately surrounding the home]; *People v. Celis* (2004) 33 Cal.4th 667, 676.) "This presumption can be overcome by a showing of one of the few 'specifically established and well-delineated exceptions' to the warrant requirement." (*Celis*, at p. 676.) One such exception is an exigent circumstance, defined as "an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence." (*People v. Ramey* (1976) 16 Cal.3d 263, 276; accord, *Kentucky v.*

12

*King* (2011) 563 U.S. 452, 460 ["[T]he need to 'prevent the imminent destruction of evidence' has long been recognized as a sufficient justification for a warrantless search"]; *Minnesota v. Olson* (1990) 495 U.S. 91, 100; *Celis*, at p. 676.) "[T]he exigent circumstances test involves a two-step inquiry: first, factual questions as to what the officer knew or believed and what action he [or she] took in response; second, a legal question whether that action was reasonable under the circumstances." (*People v. Duncan* (1986) 42 Cal.3d 91, 97.)

We need not reiterate the facts known to Pulsipher and Graham, as they are set forth in full above. It suffices to say that, given defendant's behavior, the detectives reasonably believed the black box contained contraband related to drug dealing, and it landed in an area that, as far as they knew, was accessible to occupants of the apartment complex. The detectives had no way of knowing that access to the yard was exclusive to defendant's apartment or, even if they had so known, whether there might be someone in the apartment that could take the box. Given all of these circumstances, it was reasonable for the detectives to believe there was an imminent danger of someone absconding with the box if they did not retrieve it.

### Graham Did Not Violate the Fourth Amendment When She Searched the Black Box

Defendant next contends that even assuming there was an exigency to recover the box, there was no exigency requiring Graham to open it. He relies on *People v. Pace* (1979) 92 Cal.App.3d 199 to support his claim that once he was handcuffed in the police car and the detectives had the box in their exclusive control, there was no danger of him accessing a weapon or destroying evidence in the box, and thus the warrantless search of the box was unjustified. The magistrate found, however, that defendant abandoned

the box, and that finding is supported by substantial evidence. (See *People v. Parson* (2008) 44 Cal.4th 332, 346 [court's finding of abandonment must be upheld if supported by substantial evidence].)

"It is well established that a search and seizure of abandoned property is not unlawful because no one has a reasonable expectation of privacy in property that has been abandoned. . . . [¶] It is, of course, well established that property is abandoned when a defendant voluntarily discards it in the face of police observation, or imminent lawful detention or arrest, to avoid incrimination." (*People v. Daggs* (2005) 133 Cal.App.4th 361, 365.) Abandonment rests on defendant's objective manifestations of intent to abandon the properly. (*Id.* at p. 369.) Pulsipher's testimony—that as defendant attempted to evade the detectives, he raised the box up to toss it over the fence, and the box went over the fence when Pulsipher made contact with him—supported the magistrate's finding of abandonment. (See, e.g., *People v. Brown* (1990) 216 Cal.App.3d 1442, 1451 ["defendant's act of dropping the bag before making a last-ditch effort to evade the police supports the trial court's finding that defendant indeed abandoned the paper bag and lost any reasonable expectation of privacy in its contents"].)

Defendant objects that the record is "ambiguous as to precisely how the box ended up in the patio" of his apartment, but the record need not be definitive for there to be substantial evidence supporting the magistrate's finding. "Substantial evidence is 'evidence which is reasonable, credible, and of solid value.' [Citation.] Put another way, ' " '[s]ubstantial evidence' means that evidence which, when viewed in light of the entire record, is of solid probative value, maintains its credibility and inspires confidence that the ultimate fact it addresses has been justly determined." ' " (*People v. Zorich* (2020) 55 Cal.App.5th 881, 886.) Such evidence exists here when one

14

considers Pulsipher's testimony in the context of defendant's attempt to evade the officer and flee with a box containing narcotics, a handgun, and ammunition.

Defendant also argues that because the fenced-in yard area was exclusive to his apartment, he had a reasonable expectation of privacy in that area, and once the box was on his patio he had a reasonable expectation of privacy in the box as well. But, as noted, his subjective intent is irrelevant to the analysis, as abandonment rests on an objective manifestation of intent to relinquish an expectation of privacy in a particular object. (*People v. Parson*, *supra*, 44 Cal.4th at p. 346; *People v. Daggs*, *supra*, 133 Cal.App.4th at p. 369.)

Defendant also seems to suggest that the abandonment doctrine only applies when an item is discarded in a public area, pointing in claimed support to the authorities on which the prosecutor relied to oppose the motion to suppress. (See *California v. Greenwood* (1988) 486 U.S. 35, 37–41 [garbage bags left on the curb for city collection]; *People v. Gallego* (2010) 190 Cal.App.4th 388, 396 [cigarette butt discarded on a public sidewalk]; *People v. Siegenthaler* (1972) 7 Cal.3d 465, 470 [stolen property "abandoned on a sidewalk and in plain view"]; *People v. Brown*, *supra*, 216 Cal.App.3d at p. 446 [paper bag dropped in a dance hall].) While the cited cases indeed found abandonment in public areas, defendant cites no authority suggesting that abandonment must occur in a public area.

Finally, defendant discusses *People v. Pace*, *supra*, 92 Cal.App.3d 199, contending his situation was similar to that in *Pace*, where the court held that the warrantless search of Pace's lunchbox violated the Fourth Amendment because he was handcuffed and in the patrol car and thus "had no access to it and could neither extract a weapon from it nor destroy any of

15

its contents." (*Id.* at p. 204.) *Pace* has no applicability here in light of the supported finding that defendant abandoned the black box.

## DISPOSITION

The judgment of conviction is affirmed.

_____
Richman, Acting P.J.

We concur:


_____
Stewart, J.


_____
Miller, J.


*People v. Young* (A156553)

17